
**UNITED STATES, Appellee**

v.

**James N. COPPOCK, Senior Airman U.S. Air Force, Appellant.**

No. 68,005.
CMR No. 29009.

U.S. Court of Military Appeals.

Argued April 7, 1993.

Decided June 25, 1993.

For Appellant: *Captain Ursula P. Moul* (argued); *Colonel Terry J. Woodhouse* (on brief); *Major Alice M. Kottmyer.*

For Appellee: *Major John H. Kongable* (argued); *Colonel Richard L. Purdon* and *Lieutenant Colonel Jeffery T. Infelise* (on brief); *Lieutenant Colonel Brenad J. Hollis.*

*Opinion of the Court*

CRAWFORD, Judge.

Pursuant to his pleas, appellant was convicted of two separate desertions, escaping from confinement, carnal knowledge, two automobile larcenies, assault on a civilian police officer, and kidnapping a 4–year–old child, in violation of Articles 85, 95, 120, 121, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 885, 895, 920, 921, 928, and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 25 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence, except for confinement exceeding 19 years. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated April 2, 1992. We granted review on the following issue:

> WHETHER THE MILITARY JUDGE COMMITTED AN ABUSE OF DISCRETION BY DENYING APPELLANT'S CHALLENGES FOR CAUSE AGAINST LIEUTENANT COLONEL JASPER AND MAJOR MCDUFFIE.

We resolve this issue adversely to appellant.

On March 26, 1990, appellant was lawfully ordered into pretrial confinement at Keesler Air Force Base confinement facility. On April 17, 1990, he escaped from confinement. The next morning Airman Coppock appeared at a Ford dealership about fifteen to twenty miles from the Air Force base. He asked to see a small, fuel-efficient car. He was shown a Ford Festiva. During the test drive, he drove away from the salesman as they stopped to ex-

change seats. About 45 minutes later he was spotted at a local gas station. The civilian authorities were notified, and he was apprehended following a high-speed chase.

After appellant's pleas of guilty were accepted, court members were sworn and voir dire took place. Appellant claims that the judge abused his discretion when he did not grant appellant's challenges for cause against Lieutenant Colonel Jasper and Major McDuffie.

During the individual voir dire, Lieutenant Colonel Jasper answered as follows:

Questions by the Military Judge:

Q: [W]hat we would like to find out is what you've heard or read or seen about this case, if anything.

A: Do you want me to just answer the general question, sir?

Q: Please.

A: I do remember seeing on TV when Airman Coppock left the security here at Keesler and there was some television coverage of that, that he—he had escaped and was gone for some time and was apprehended by civilian authorities in southern Mississippi, that there was some sort of a chase involved in it, and at the end of that chase, I think there was a car crash and Airman Coppock needed some medical attention after that.

Q: Anything else that you remember?

A: Oh, general circumstances about why he was confined concerned coming here from Spain with a minor and a small child—abducting a small child; but only in generalities.

Q: Did the media coverage cause you to form an opinion as to whether the accused actually committed all the offenses suggested in the coverage?

A: I don't believe so, no.

Q: Did the media coverage cause you to form any personal animosity towards Senior Airman Coppock?

A: No.

Q: Did the media coverage or what else you may have learned about the case

cause you to form an opinion as to an appropriate kind or amount of punishment to impose in this case?

A: No.

Q: Now, I've already told you that the accused entered a plea of guilty and I found him guilty of the offenses that you have before you and evidence is going to be presented later in the trial so that the members can decide on an appropriate sentence for this accused. Can you lay aside any impressions you might have formed because of what you heard about this case and determine an appropriate sentence for this accused based solely upon the evidence you hear in this court?

A: Yes.

\* \* \*

Questions of Trial Counsel:

\* \* \*

Q: Sir, you mentioned that you had some awareness of what you described as the general circumstances about why Airman Coppock had been confined. Was that something you also heard on television broadcasts?

A: I think that is where I picked up the information solely. I don't remember reading about it in the newspaper.

Q: Do you remember this being a single television broadcast that you saw or was this over a course of several days?

A: I really—I really couldn't tell you.

Q: I know we're asking you to think back in time, but can you recall about how long it's been since you recall having been exposed to this information at all?

A: Oh, it was in February, I believe.

Q: On the 27th of April, do you remember receiving a directive from Major General Harvey to avoid any media coverage related to this accused or the facts surrounding the case?

A: I do.

Q: Have you done that since the 27th?

A: I have.

Q: Other than this one television broadcast that you described for us, do you

believe that you have been exposed, even inadvertently, to any coverage before or after the 27th of April?

A: I have not since the 27th of April. Aside from what I described, I can't remember any other time, no.

Q: Do you understand, as the judge has explained to you, the importance of your decision in this case being based upon the evidence that comes before you in the courtroom, do you not?

A: I do.

Q: Do you believe that you are able to limit your judgment on the amount and type of punishment that Airman Coppock should receive to the facts that you consider here in the court and not something that you heard about during a television broadcast?

A: Yes.

Q: Do you also believe that it will be possible for you to avoid, as the judge has instructed you, any continued exposure to media coverage from this point forward until the trial concludes?

A: Yes.

TC: Nothing else, sir.

MJ: Captain Miller?

Questions by Defense Counsel:

Q: [W]hat were your thoughts when you saw that coverage on TV?

A: The—my primary thoughts at that time were that we were going through a major command inspection and this was a heck of a time for this to happen.

Q: Did that inspection include part of your group?

A: It did.

Q: Any other thoughts?

A: That it was, primarily, and I can't— I'm trying to remember. Yes, that was my major thought and that I hope he was reapprehended quickly.

Q: Was that because you felt he presented a danger?

A: No, just because he had been in confinement and shouldn't—should not have escaped and we needed to get him back into confinement.

Q: Did you take any measures, any steps in response to your personal life or in your professional life?

A: No, neither.

Q: You read the letter that General Harvey sent out?

A: Yes.

Q: What did you do to try to implement this?

A: Well, I showed it to my wife; and, as I said earlier, I don't subscribe to the paper; but, since that time, I have not read anything in the paper or anywhere else concerning the case; and I have not heard anything on the television news, radio news, or any kind of news concerning the case until this morning before I came to work; and I heard Airman Coppock's name; and I left the room. Actually, I was on my way out of the room anyway and I heard it; and I just kept going; and I didn't hear anything besides his name.

Q: Did it say that they were going to have a trial today or—

A: I don't know. Again, I heard the name and about that time, my wife, who read the letter, told me that I— that something was on TV about the trial. I don't remember exactly what she said, but I just kept going out of earshot of the TV; and I—I didn't hear anything besides his name.

Q: Has anything about this case come up in any official correspondence that you've seen, any staff meetings that you've been at?

A: No correspondence and I don't think it was talked about in the staff meetings. Not that I can recall.

Q: How about the impact of that on the inspection that was going on?

A: That's what I was trying to remember, whether anybody had mentioned it at staff meetings. If it did come up, I don't remember it. I wouldn't swear either way; but I don't remember any comments.

Q: Any casual conversations you can recall about—with other people about the case?

A: No. Yes, but just—just, again, that someone had escaped during the—during the inspection, wasn't that bad timing, and, again, hope that he would be apprehended.

Q: Do you attend any status of discipline meetings on Keesler?

A: No.

Q: Do you have any personal or professional reason to have any contact with the media?

A: No.

During individual voir dire, Major McDuffie stated:

Questions by Military Judge:

Q: Would you tell us what you heard about this case or saw on TV before you came into court today?

A: The last thing I remember seeing was in the news media about him escaping from the jail.

Q: What about before that? What can you remember about either media coverage or talk on base?

A: About the little girl, where they were. And, then, they found him in—up north and brought him back. And then, the escape; and I was talking to somebody on base about how he escaped.

Q: Who were you talking to, do you remember?

A: The guy's name was Jim Martin. He works in Air Base Group.

Q: Does he have anything to do with the Security Police?

A: No, he was just talking to somebody in Security Police about the case; that's all.

Q: What did you hear about how he escaped?

A: That he overpowered the guard and got out from the compound; jumped the fence; stole a van; that the van was left, I believe, by Pass Road; and he jumped the gate on Pass Road. And in the news media where they caught him in a police chase. I saw the damage to the cars and that's about it. That's what I remember.

Q: All right. So, you heard on the news that there was a kidnapping?

A: And taking the little girl, yes, sir.

Q: Anything else that you can remember that you haven't already told me?

A: Not that I can remember, no, sir.

Q: Did the media coverage and your discussion with this gentleman cause you to form an opinion as to whether the accused had actually committed the offenses of which the press, the media coverage was about?

A: Whether he actually did it?

Q: Yes.

A: If you're asking me if I thought he was guilty, I think I'd have to say yes on that.

Q: Okay. Did it cause you to have any personal animosity towards the accused?

A: No, sir, not that I can remember.

Q: Did it cause you to form an opinion as to an appropriate kind or amount of punishment that should be imposed?

A: Oh, no, sir.

Q: Now, as I told you before, we're going to hear evidence as to what the facts and circumstances surrounding these offenses—what actually occurred. Can you law [sic] aside any of the information that you heard before and reach a decision on sentence solely based on the information that you will be provided in this court?

A: Yes, sir, I believe I can.

*      *      *

Questions by Trial Counsel:

Q: Major McDuffie, you sort of generically referred to the media as a source of much of this information back in April. Were you learning of this from the newspapers, from television, from radio? Do you recall where you learned of the facts?

A: I read about some of it in the paper and I saw some of it on TV and, of course, on the radio when I was driving to work.

Q: On the 27th of April, do you recall receiving a letter from Major General

Harvey directing you to avoid that kind of exposure?

A: Yes, I do.

Q: Since that time, have you heard, seen, or read anything about either the accused or the facts of the case?

A: The only thing I remember was—of course, being single, you know, I do get the morning paper. I tried to see what the headlines is and I saw something on his name, I think, last Thursday; and I just said throw that side away.

Q: Did you read anything other than the accused's name before disregarding the paper?

A: No. No.

Q: Was that the local paper, the Sun Herald?

A: Yes, it was.

Q: You also mentioned having had a conversation with someone who works for the Air Base Group and I didn't quite understand who that was.

A: Jim Martin.

Q: Is that a military member?

A: No, he's a civilian. He's a resource manager and works in the Air Base Group Command Section.

Q: What was your understanding as to the source of the information Jim Martin was giving to you?

A: He had talked to—I'm going to mispronounce his name—Captain Ammerman, the Security Police Ops Officer. He said he got his information from him. Jim Martin—Jim came down to the office to work on a project and we got to talking about it.

Q: What's your association with Mister Martin?

A: Just work; not coworkers. I work in Manpower. We were just working a special project and he came down to the building that day and we just started talking.

Q: The judge explained to you a little bit earlier about the importance of your continuing to do what you have been doing and that is to avoid even inadvertent exposure to some media coverage of the facts of the case or facts related to this accused. Particularly since you are single, do you believe you are going to have any trouble in being able to carry out that order of the court?

A: No, I've already decided that, if I am a court member or on the panel, then I'll just ignore the paper and I don't watch news hardly any anyway.

Q: You mentioned to the judge that, at least when you first started to learn of these accounts as they were reported, it caused you to believe that the accused had, in fact, committed the acts that you were reading about. Do you believe, even having felt that way when you first read the accounts, that you can adjudge a punishment based solely on the evidence that comes before you in this courtroom and not stories that you read in the past that may or may not be accurate?

A: Yes, I think I can.

Q: Would you agree that there is a possibility that some of what you read or some of what you heard, even from Mister Martin, is not accurate?

A: If it's not accurate, then won't that come out here?

Q: That's what I'm asking you. Will you adjudge a punishment based upon facts that are presented before you and not what you assume to be facts that you learned from the media or a coworker?

A: Yes, I will.

\* \* \*

MJ: ... [W]hat happens if something that you may have heard is not covered in any way by what you hear here in court?

MEMBER (Maj. McDuffie): In what way, sir?

MJ: Well, for instance, say you recall hearing an item in the news or in talking to someone that we don't cover in any way in the evidence that's presented in here in court, how are you going

to—what are you going to do with that information?

MEMBER (Maj. McDuffie): Sir, I don't really know how to answer that question because I've tried to block everything out on this case.

MJ: If it comes to mind?

MEMBER (Maj. McDuffie): Then I would be allowed to ask a question, right?

MJ: Well, if it comes to mind, can you put it out of your mind?

MEMBER (Maj. McDuffie): Oh, yes, sir. I will try to do that.

MJ: At least disregard it in adjudging a sentence?

MEMBER (Maj. McDuffie): Yes, sir.

MJ: Captain Miller.

Questions by Defense Counsel:

Q: When you were describing for His Honor what you had heard, I believe I heard you mention something about 'up north.' What were you talking about?

A: I think they went up north—I think it was in Virginia and stayed up there where they found the little girl, just what I saw on the news or read in the paper. That was about it. I mean, that's up north to me because I am in Mississippi.

Q: Right. Anything else about up that way?

A: No, no.

Q: We also got a copy of the biographical information. It mentions here that you have sat on six courts-martial and were removed from four. Was that because there was a judge alone trial so there was no court panel?

A: No. The first three courts-martial I was removed from were when I first came into the Air Force, stationed at Charleston, South Carolina; and I was in charge of Quality Force, separating three individuals; and instead of separation, they went to trial; and there was a female; and I was the senior ranking female in Charleston; so, they wanted a female on the panel. And, so, since I knew the whole case, I guess—

Q: They disqualified you?

A: They did; they disqualified me on that one. The other one, it was out in Utah, I think in '86 or '87, I have no idea why I was eliminated from that one.

Q: How long have you known Mister Martin?

A: October, I'll be on base two years; so, it's 18 months, 12 months, basically.

Q: Is he a pretty reputable guy?

A: I guess, yes. I don't deal with him on a day-to-day basis; just whenever I'm working an issue with Air Base Group.

Q: Do you know of a Captain Ammerman?

A: (Affirmative nod.)

Q: Where does he work?

A: I don't know where he works now, but he used to be working in the Security Police squadron.

DC: Thank you much, ma'am.

■ Appellant urges that Lieutenant Colonel Jasper and Major McDuffie were not impartial court members. Both had been exposed to extensive pretrial coverage of the case, and both expressed a prejudgment of appellant. Appellant argues the very fact that the members had been exposed to outside information raises the possibility that they would consider highly prejudicial and inadmissible evidence. Even though the court-martial was seated for sentencing only, he focuses on Major McDuffie, alleging that she believed from the media coverage that appellant was guilty of the reported offenses and this created a potential spillover to sentencing. Major McDuffie did state that she could set aside this opinion of guilt and render an appropriate sentence based solely upon the evidence.

The Constitution, the Uniform Code of Military Justice, and the Manual for Courts–Martial provide that appellant is entitled to court members who will keep an open mind and arrive at an appropriate sentence based on the evidence and the instructions from the judge. *United*

*States v. Reynolds,* 23 MJ 292 (CMA 1987). The Manual, like the Federal statute—28 USC § 1865(b)—sets forth various grounds for challenge. The specific ground relied upon in this case is RCM 912(f)(1)(N), Manual for Courts–Martial, United States, 1984, which requires excusing a member "whenever it appears that the member . . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality."

This is the fourth case this Term dealing with challenges for cause. *See United States v. Lake,* 36 MJ 317 (CMA 1993); *United States v. White,* 36 MJ 284 (CMA 1993); *United States v. Bannwarth,* 36 MJ 265 (CMA 1993). As this Court said in *White,* "A trial court's standard is to grant challenges for cause liberally" and this Court "will not overturn the military judge's determination not to grant a challenge except for a clear abuse of discretion in applying the liberal-grant mandate." 36 MJ at 287. Both Lieutenant Colonel Jasper and Major McDuffie indicated that they had not formed an opinion as to an appropriate sentence and could base their views as to any punishment in the case only upon the facts they heard in court. Thus we hold the military judge did not abuse his discretion in denying the challenges for cause.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, GIERKE, and WISS concur.