**UNITED STATES, Appellee,**

v.

**Ricky R. WHITE, Staff Sergeant U.S. Marine Corps, Appellant.**

**No. 67,367.**
**NMCM 90–2165.**

U.S. Court of Military Appeals.

Argued Oct. 2, 1992.

Decided Feb. 25, 1993.

For Appellant: *Lieutenant David P. Sheldon,* JAGC, USNR (argued); *Lieutenant Mary L. Livingston,* JAGC, USNR (on brief).

For Appellee: *Lieutenant Ralph G. Stiehm,* JAGC, USNR (argued); *Colonel*

*T.G. Hess*, USMC (on brief); *Commander William F. Shields*, JAGC, USN.

*Opinion of the Court*

GIERKE, Judge:

Appellant was a recruiter. A special court-martial composed of officer and enlisted members convicted him, contrary to his pleas, of conspiracy to effect a fraudulent enlistment and two specifications of effecting fraudulent enlistments, in violation of Articles 81 and 84, Uniform Code of Military Justice, 10 USC §§ 881 and 884, respectively.

The granted issue is:

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED BY APPLYING A "GREAT DEFERENCE" STANDARD WHEN REVIEWING THE MILITARY JUDGE'S DENIAL OF APPELLANT'S CHALLENGES FOR CAUSE.

Three challenges for cause are at issue in this case: Major (Maj.) Santana, Captain (Capt.) Olsen, and Master Sergeant (MSgt.) Scott. Appellant challenged Maj. Santana on two grounds: (1) he was the "reporting senior" of another court member, Gunnery Sergeant (GSgt.) Simmons, and thus responsible for evaluating his duty performance; and (2) his duties as Public Affairs Officer had exposed him to the convening authority's view on fraudulent enlistment, including the convening authority's "interest in the outcome of" appellant's case.

The *voir dire* of Maj. Santana included the following:

Q. [Trial counsel] And, sir, the fact that you are his reporting senior, would that, in any way, shape or form, [a]ffect your ability to render a fair and impartial decision, no matter what position he takes in the deliberation room?

A. [Maj. Santana] None whatsoever. He has got a mind of his own.

[Trial counsel] Thank you, sir. I have no further questions.

[Military judge] In fact, Major, I will be instructing you later on, if you remain on the court, that you may not use your rank or superiority in any way to impinge on the independence of any of the juniors, including Gunnery Sergeant Simmons. Do you think that you will be able to follow that direction?

[Maj. Santana] Very much so.

Regarding Maj. Santana's duties as Public Affairs Officer, defense counsel questioned him as follows:

Q. .... Sir, the question has already been asked, but I just want to clarify in my own mind, have you heard any allegations about Staff Sergeant White in reference to this case?

A. No. I have never heard of him, or the case.

Q. Sir, have you ever had an occasion in the hallways at District to overhear small talk or anything about the frauding of someone in?

A. About what?

Q. Frauding someone in, sir, fraudulent enlistments in general, sir?

A. I have heard the Director talking about fraudulent enlistments, but in a very general nature. Not anything beyond that that I am aware of.

Q. That would be Colonel Lilly, sir?

A. Yes.

Q. What did the Colonel say, do you recall?

A. He had requested some, I think during the Pittsburgh incident, he had requested me to clip some articles and forward them to him; anything that had to do with the Pittsburgh incident or fraudulent enlistment per se. That was about it. I would just clip the articles and send them up.

Q. Did you ever hear the Colonel express an opinion about the Pittsburgh affair?

A. About what?

Q. The Pittsburgh affair, sir?

A. Not per se, no. I don't recall anything special.

Q. The Colonel never had any discussions with you, or any other staff members about fraudulent enlistments at 6th Marine Corps District?

A. (Pause.) I am trying to recall. The conversations that I would always hear,

when we were traveling through the Recruiting Stations, I think were of a positive nature, how you should do things right. I don't recall ever getting into fraudulent enlistments per se. In the monthly comments that he puts in the Dixie Digest Magazine, it has always been "these are the things that you should be doing." Fraudulent enlistments per se, I don't think, were singled out.

Q. Sir, have you ever heard the Director talk about a specific fraudulent case at 6th Marine Corps District?

A. No.

Appellant challenged Capt. Olsen because he had "an intimate knowledge of how a recruiter works, quality control; and he has been schooled in those areas and would bring his expertise ... to the outcome of this court." Capt. Olsen was questioned by the military judge regarding his particular expertise as follows:

Q. Captain, you indicated that you may have some background information, having received some training in this area. Would you be able to, first of all, decline from using your expertise in this area, from imposing that upon the other members? Now, there is nothing wrong with bringing in your own experience and background, but you would not be able to use that background to lecture, or add evidence and facts, not before you in court. Do you understand that?

A. Yes, sir.

Q. Would you be able to follow that direction?

A. Oh, yes, sir.

Q. And, would you be able to base your findings; and, if necessary, sentence, based on just what comes into evidence in this trial?

A. I don't see any problems with that at all, sir.

Appellant challenged MSgt. Scott because he had audited the recruiting substation where the offenses allegedly took place and had lunch on the day of the trial with Capt. Sinnott, a government witness and the executive officer of appellant's recruiting substation. MSgt. Scott was questioned by trial counsel as follows:

Q. And, how is it that you know Captain Sinnott?

A. As the Comptroller Chief, I am required to go out and inspect the Accounting Records of all R.S.'s [recruiting stations]. Captain Sinnott was the Executive Officer of R.S. Montgomery. I inspected his accounts, sir.

Q. On a number of occasions, on a quarterly basis?

A. Semi-annual, sir.

Q. And, how long have you been with the 6th Marine Corps District, in that capacity?

A. Three and a half years, sir.

Q. So, I assume that on at least six occasions you audited Captain Sinnott?

A. Yes, sir, at least six occasions.

\* \* \*

Q. And, that relationship that you had with Captain Sinnott was strictly on a professional basis?

A. Yes, sir.

Q. Now, based on that professional relationship that you have had with Captain Sinnott over the last three years, would you be more inclined to give greater weight and deference of his testimony vis-a-vis any other witness that might appear before this court?

A. No, sir.

Defense counsel then questioned MSgt. Scott as follows:

Q. Master Sergeant Scott, I was at lunch today, and I believe I saw you eating lunch with Captain Sinnott?

A. Yes, sir, that is correct.

Q. Sir, did you have an occasion to discuss any of today's case—

A. No, sir. The only thing that we discussed at lunch was Boy Scout activities which I am involved in here in Atlanta.

The military judge denied all three challenges, and the Court of Military Review upheld the military judge's rulings, stating, "The military judge's decision on the bias

of the potential members is entitled to great deference on appeal and will not be reversed absent a clear abuse of discretion." Unpub. op. at 4 (July 30, 1991). In *United States v. Reynolds*, 23 MJ 292 (CMA 1987), Judge Cox, writing for the majority, used similar language, stating:

> The question of bias "is essentially one of credibility, and therefore largely one of demeanor." Due to his superior position, the military judge's determination of bias is entitled to great deference on appeal and will not be reversed absent a clear abuse of discretion. *United States v. Deain*, 5 USCMA 44, 17 CMR 44 (1954).

23 MJ at 294 (citation omitted). The court below cited this authority.

*Deain* made no mention of "great deference," but the lead opinion by Chief Judge Quinn stated, "There must be a clear abuse of discretion in resolving the conflict before an appellate tribunal, which lacks the power to reweigh the facts, will reverse a decision." 5 USCMA at 49, 17 CMR at 49. Judges Latimer and Brosman concurred in the result, analyzing the merits of the challenge for cause.

Judge Cox later wrote the principal opinion in *United States v. Jobson*, 31 MJ 117 (CMA 1990), in which he made no mention of "great deference" but simply said, "[W]e conclude that the military judge did not abuse his discretion in denying the challenge...." 31 MJ at 122. Chief Judge Sullivan concurred, while "disagree[ing] with any construction of [Judge Cox's] opinion which would establish a 'great deference' standard." 31 MJ at 122. Senior Judge Everett concurred in part and dissented in part, noting that the Court of Military Review had held that the challenge should have been granted but opining that the Court of Military Review "should give some weight to a determination by the military judge that a court-martial member is competent." 31 MJ at 123.

Appellant argues that giving the military judge's ruling on a challenge for cause "great deference" is inconsistent with the liberal-grant mandate underpinning the challenge procedure. The liberal-grant mandate was expressly set out in paragraph 62*h* (2) of the Manual for Courts–Martial, United States, 1951, and carried forward in paragraph 62*h* (2) of the Manual for Courts–Martial, United States, 1969 (Revised edition). RCM 912(f)(3), Manual for Courts–Martial, United States, 1984, does not contain an express statement of the liberal-grant mandate, but deletion of the express language was "not intended to change the policy expressed in that statement." Drafters' Analysis, 1984 Manual, *supra* at A21–54; *United States v. Smart*, 21 MJ 15, 18–19 and n. 1 (CMA 1985). *See United States v. Glenn*, 25 MJ 278, 279 (CMA 1987) ("Challenges for cause are to be liberally granted.").

■ A trial court's standard is to grant challenges for cause liberally. An appellate court's standard is to overturn a military judge's ruling on a challenge for cause only for a clear abuse of discretion. This means that military judges must follow the liberal-grant mandate in ruling on challenges for cause, but we will not overturn the military judge's determination not to grant a challenge except for a clear abuse of discretion in applying the liberal-grant mandate.

■ "Great deference" is not a separate standard but, rather, is the reason for the standard. We give a military judge great deference because we recognize that he has observed the demeanor of the participants in the voir dire and challenge process. Because we give the military judge great deference, we will overturn his ruling on a challenge only if we find a clear abuse of discretion.

Based on the foregoing discussion, we are satisfied that the Court of Military Review applied the correct standard. We turn next to review the military judge's rulings.

■ We hold that the military judge did not abuse his discretion by denying the challenge of Maj. Santana. Maj. Santana's position as GSgt. Simmons' superior and rater was not *per se* disqualifying. *United States v. Blocker*, 32 MJ 281 (CMA 1991). Both Maj. Santana's and GSgt. Simmons'

responses during voir dire established that Maj. Santana would not attempt to influence GSgt. Simmons and that GSgt. Simmons would not allow Maj. Santana to influence him.

■ We likewise hold that the military judge did not abuse his discretion by denying the challenge of Capt. Olsen. Technical expertise is not automatically disqualifying. *United States v. Towers*, 24 MJ 143 (CMA 1987). This was not a case involving the technical intricacies of military recruiting; it involved a simple scam of enlisting otherwise ineligible recruits by providing them with bogus high school diplomas. Capt. Olsen's responses disclosed no basis for disqualification for duty as a court member.

■ Finally, we hold that the military judge did not abuse his discretion by denying the challenge of MSgt. Scott. Although contact between witnesses and court members, even if innocent or inadvertent, gives rise to perceptions of unfairness, it is not automatically disqualifying. *United States v. Elmore*, 33 MJ 387, 392–94 (CMA 1991). In this case the voir dire disclosed in full the innocuous nature of the contact.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judges COX and CRAWFORD concur.

SULLIVAN, Chief Judge (concurring):

I agree with Judge Gierke's opinion in this case. The pertinent question before this Court and the Court of Military Review is whether the military judge clearly abused his discretion in applying "the President's" policy favoring grants of challenges for cause at courts-martial. *See United States v. Jobson*, 31 MJ 117, 122 (CMA 1990) (Sullivan, C.J., concurring); *United States v. Nigro*, 28 MJ 415, 417 (CMA 1989); *United States v. Smart*, 21 MJ 15, 19 (CMA 1985).

The standard of clear abuse of discretion is appropriate in most cases whether the challenge is for actual bias or implied bias. *See United States v. Polan*, 970 F.2d 1280, 1284 (3d Cir.), *cert. denied* (Feb. 22, 1993); *United States v. Hinojosa*, 958 F.2d 624, 631 (5th Cir.1992); *United States v. Gordon*, 812 F.2d 965, 970 (5th Cir.), *cert. denied*, 483 U.S. 1009, 107 S.Ct. 3238, 97 L.Ed.2d 743 (1987). However, where the basis of the challenge is implied bias under RCM 912(f)(1)(N), Manual for Courts–Martial, United States, 1984, it would constitute a clear abuse of discretion to deny it solely on the basis of a military judge's credibility determination because implied bias is judged by an objective standard. *See United States v. Glenn*, 25 MJ 278, 279–80 (CMA 1987); *United States v. Miller*, 19 MJ 159, 164 (CMA 1985); *United States v. Rosser*, 6 MJ 267, 272–73 (CMA 1979); *Marsch v. Commonwealth*, 743 S.W.2d 830, 833–34 (Ky.1987). *See generally Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring).

The military judge ruled on trial defense counsel's challenges for cause as follows:

MJ: Defense, do you have any challenges for cause?

DC: Yes, sir. At this time, we challenge Major Santana for cause for two reasons. One, he is the reporting senior for Gunnery Sergeant Simmons; and, secondly, part of his billet as the Public Affairs Officer, is to keep the District Director informed of current developments, which include fraudulent enlistments. I believe, if I understood the Major correctly, he got it that the District Director was concerned about the fraudulent enlistment problem— Therefore, he has a continuing interest in fraudulent enlistment— and, as such, sir, an interest in the outcome of this case, sir.

MJ: The challenge for cause is denied against Major Santana. Everything that I heard from him indicates that he can be a fair and impartial member of the panel.

Any further challenges for cause?

DC: Yes, sir. We would challenge Captain Olsen for cause on the basis that he has an intimate knowledge of how a recruiter works, quality control; and he has been schooled in those areas and would bring his expertise, the Defense believes, to the outcome of this court; and, as such, would have an unfair advantage over the other members; and, he might possibly influence their decision making, sir.

MJ: The challenge for cause against Captain Olsen is denied. He indicated right there on the record, when I brought to his attention that he could not use his expertise to influence the other members, that he would not do so.

Any further challenges for cause?

DC: Yes, sir. We would challenge Master Sergeant Scott in that Defense Counsel personally observed him having lunch with a Government witness; and, that he has admitted that they share a mutual interest in Boy Scouts; and, that he has had on occasions spoken to Captain Sinnott, on numerous occasions——

MJ: Your challenge for cause against Master Sergeant Scott is denied. He indicated that he would be able to, that basically his information or interaction was very limited; and, that he would give the same weight and credence to his testimony as anybody else's.

Any further challenges for cause?

DC: No further challenges for cause, sir.

In the present case, appellant did not make clear whether he was challenging these members because of actual bias or implied bias. Accordingly, I find no clear abuse of discretion on the judge's part in

denying these challenges on the basis of his belief in the members' disclaimers.

WISS, Judge (concurring):

The issue before this Court is one in which appellate courts must take care to be precise in articulation and application—and one, as well, which appellate counsel before this Court should uniformly address at the outset of their pleadings on any issue: What is this Court's standard of review? * I agree with the majority that our standard of review regarding denial of challenges for cause is "clear abuse of discretion." 36 MJ at 287.

To be sure, in applying this standard, we should and we do grant certain discretion to the military judge's ruling for the reasons identified by the majority. I confess to being uneasy about describing this discretion by the term "great deference," which has found its way into some of our precedents, for that term could cause confusion with the "clear abuse of discretion" standard of review applicable here. For instance, the United States Court of Appeals for the District of Columbia has viewed "great deference" to permit reversal of a trial judge's ruling only for a "grave abuse of discretion." *United States v. Johnson*, 970 F.2d 907, 912 (D.C.Cir.1992), citing *United States v. Payne*, 805 F.2d 1062 (D.C.Cir.1986).

I suppose that, as long as our standard of review is precise, it is relatively unimportant how we describe the discretion which we extend to the military judge. One noted authority has observed, in the following language, the tendency of courts

* "What is the basis for federal jurisdiction— for appellate jurisdiction? What standards of review apply to the issues presented in this appeal?"....

  \*     \*     \*

  The two appellate inquiries, which should be at the threshold of the consideration of every appeal, are too often ignored. Usually the jurisdictional inquiry is quickly answered. Not unusually, the second question is less quickly answered. But answer it one must,

for the value of the brief and oral argument depends upon and is measured against a proper understanding and application of the appropriate standards of review. The disposition of the appeal necessarily revolves around the proper standard of review. Woe unto the lawyer and litigant who urges the wrong standard or no standard at all! Honorable Henry A. Politz, United States Circuit Judge, Foreword to S. Childress and M. Davis, *Federal Standards of Review*, vol. 1 (2d ed.1992).

to wind themselves around the axle in defining such terms:

Even with an established standard, the catchphrase usually fights simple definition. One senses the circular difficulties courts may have in explaining *abuse of discretion:* "In a legal sense discretion is abused whenever in the exercise of its discretion the court exceeds the bounds of reason, all of the circumstances before it being considered." Or discretion means "sound discretion, exercised with regard to what is right and in the interests of justice"; discretion not so exercised is abused. Endless definition and recitation adds nothing and eventually may confuse the intended scope, as when courts defining *clearly erroneous* by some comparison to *substantial evidence* are later misread as equating the two tests.

S. Childress and M. Davis, *Federal Standards of Review,* vol. 1, § 1.02 at 1–14 to 1–15 (2d ed.1992) (footnotes omitted).

Accordingly, I concur that, whether we describe the deference that we extend to the military judge's ruling as "due deference" or "great deference," we will reverse the judge's ruling on a challenge for cause only when the military judge has clearly abused his discretion. I concur, as well, that part of that discretion involves following the liberal-grant mandate.