550

UNITED STATES

v.

Senior Airman Gary Q. DIMBERIO,
United States Air Force.

ACM 33091.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 24 Oct. 1999.

Decided 19 Oct. 1999.

Appellate Counsel for Appellant: Captain Patience E. Schermer (argued), Colonel Douglas H. Kohrt, Colonel Jeanne M. Rueth, Lieutenant Colonel Ray T. Blank, Jr., and Captain Tishlyn E. Taylor.

Appellate Counsel for the United States: Major Bryan. T. Wheeler (argued), Colonel Anthony P. Dattilo, and Lieutenant Colonel Ronald A. Rodgers.

Before SNYDER, Chief Judge, SCHLEGEL, and SENANDER, Appellate Military Judges.

## OPINION OF THE COURT

SCHLEGEL, Judge:

A general court-martial composed of officer and enlisted members convicted the appellant of assaulting his infant son with a means or force likely to cause death or grievous bodily harm in violation of Article 128, UCMJ, 10 U.S.C. § 928.[1] The members sentenced him to a bad-conduct discharge, confinement for 9 months, forfeiture of all pay and allowances, and reduction to E-1. The convening authority approved the sentence as adjudged. The appellant alleges that the evidence is legally and factually insufficient to sustain his conviction, that the military judge erred by refusing to admit the testimony of an expert witness about his wife's mental health diagnosis and by denying a challenge for cause against a court member, and that he is entitled to a new convening authority action. After considering the briefs and oral arguments, we affirm.

### I. Legal and Factual Sufficiency of the Evidence

■ The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). When testing for legal sufficiency, we must

"draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. McGinty*, 38 M.J. 131, 132 (C.M.A.1993) (quoting *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A.1991)). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are convinced of the accused's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

The elements for the offense of aggravated assault with a means or force likely to produce death or grievous bodily harm are:

(i) That the accused did bodily harm to a certain person;

(ii) That the accused did so with a means or force;

(iii) That the harm was done with unlawful force or violence; and

(iv) That the means or force was used in a manner likely to produce death or grievous bodily harm.

*Manual for Courts–Martial, United States (MCM)*, Part IV, ¶ 54b (4)(a) (1995 ed.).

■ Jarod Dimberio was born in the hospital at Grand Forks Air Force Base, North Dakota, without complications, on 6 January 1997. He was the first child born of the marriage between the appellant and his wife, Nicole. He experienced nasal congestion and became jaundiced after birth but was discharged from the hospital on 9 January 1997. He was diagnosed with thrush, a yeast or fungal condition of the mouth, on 28 January 1997. The physician who examined him that day noted no other abnormalities. On 1 February 1997, a neighbor who saw Jarod every "four or five days" visited with the Dimberios for an hour in the afternoon. She held Jarod and fed him a bottle. In her opinion, Jarod appeared to be fine, except for the thrush.

---

1. The appellant was charged with intentionally inflicting grievous bodily harm on his son. The method alleged was shaking, striking, strangling, and/or applying force against his head and/or causing his head to strike an object with force.

The court members excepted the language indicating the infliction of grievous bodily harm was intentional and substituted language that the force used constituted a means or force likely to produce grievous bodily harm or death.

On 2 February 1997, at approximately 1930 hours, friends arrived at the Dimberios' base quarters to see Jarod and watch a football game. None of the friends noticed anything unusual about Jarod's appearance or behavior that evening. He was taken upstairs at 2200 hours by Mrs. Dimberio and fed a bottle for 15 minutes until he went to sleep. She placed him in the bed in their bedroom because it was warmer. Although Jarod could not roll over, she put pillows around him for his safety. Mrs. Dimberio then went back downstairs.

Around midnight, Mrs. Dimberio went upstairs because Jarod was crying. She changed his diaper and fed him a bottle until he went to sleep, then placed him back in the bed. She returned to the dining room to visit with her guests. None of the guests went upstairs to care for Jarod during the night. After the second feeding, the appellant went upstairs to go to sleep because he was tired from working a 12–hour shift and feeling ill. The appellant was alone with Jarod until early in the morning.

At approximately 0530 hours, 3 February 1997, Mrs. Dimberio and the remaining guests heard Jarod cry. This was the first time they heard Jarod since Mrs. Dimberio fed him around midnight. She was immediately alarmed and sensed something was wrong because Jarod's cry was different. It affected her so profoundly that she began milking, even though her milk had been gone for three days. She ran upstairs and discovered the appellant in Jarod's room, putting him in the crib. In response to her question why the baby was crying, the appellant said he did not know. After telling the appellant to turn on the light, she saw blood around Jarod's lips and noticed his nose was red.

Mrs. Dimberio took Jarod downstairs and called the base hospital but it was closed. She then called United Hospital (United) in the city of Grand Forks, North Dakota, and spoke with a Dr. Bock. After describing what was wrong with her son and being dissatisfied with the doctor's response, Mrs. Dimberio decided to take Jarod to United which was normally a 25 minute drive from the base. A friend drove them to the hospital and they arrived around 0730 hours. The appellant thought his wife was overreacting and did not go with her and Jarod to the hospital but arrived approximately two hours later.

At United, Jarod was observed to have dried blood on his nose and mouth. There were bruises under his chin and on his left clavicle. A vertical scratch/bruise was on his left cheek and a horizontal scratch/bruise was on his left forehead. There was also bruising around his nose. Neither Mrs. Dimberio nor any of the individuals who were at the house that evening saw any of these injuries before Jarod was put to bed. The examining physician documented a bulging anterior fontanel and hemorrhages in both eyes. He also detected dried blood in Jarod's mouth. A spinal tap showed gross blood in the spinal fluid. The physician suspected child abuse. He ordered long bone films and a computerized tomography (CT) scan of the head. The CT scan showed a widespread subdural hemorrhage encompassing almost the entire left hemisphere of Jarod's brain, with swelling and a midline shift of the brain from left to right. The neuroradiologist believed Jarod's injuries were consistent with shaking. His condition steadily deteriorated and eventually he was intubated and then transferred by helicopter to the pediatric intensive care unit at Meritcare Medical Center (Meritcare) in Fargo, North Dakota.

At Meritcare, he was treated by Dr. Richard Wacksman, a critical care and pediatric specialist. His evaluation of Jarod was consistent with the findings at United. However, at the time of his examination, Jarod was unresponsive. In Dr. Wacksman's opinion, Jarod's injuries were the result of intentional and severe trauma to the left front of his head that caused a sudden deceleration of the brain inside his skull. This resulted in bleeding and a rapid onset of swelling. Dr. Wacksman believed the trauma occurred within 12 hours of Jarod's admission to United. He also believed that Jarod, in response to this trauma, would have cried and then experienced a decrease in his ability to respond to the environment around him.

A pediatric radiologist from the Uniformed Services University of Health Sciences and the Armed Forces Institute of Pathology,

who reviewed a number of Jarod's CT scans, testified they showed more blood than she usually sees in child abuse cases and was more akin to the trauma that results from a very serious car accident. In her opinion, the trauma that caused his injuries occurred within 6 to 18 hours of the CT scan taken at 1000 hours on 3 February at United and was the result of a severe and violent force applied to his head. She indicated that someone rolling on Jarod or placing their arm on the back of his head could not cause the injuries. This radiologist said the CT scans also indicated that Jarod had an older subdural hematoma on the other side of his brain. She believed this injury occurred one to three weeks before 3 February and could have resulted from abuse or birth trauma. She testified unequivocally that this old subdural hematoma neither caused nor had any effect on Jarod's hospitalization.

On 5 February 1997, Air Force Office of Special Investigation (AFOSI) Special Agent (SA) Gallegos and Investigator John Ramberg, a Deputy Sheriff for Grand Forks County, interviewed the appellant at Meritcare after advising him of his rights pursuant to Article 31, UCMJ, and Mil.R.Evid. 305. First, the appellant told the investigators that he may have rolled over on Jarod while in bed with him.[2] However, when the investigators told him the doctors said that could not have caused his son's injuries, the appellant admitted he also was aware of this fact. The appellant then told them that Jarod was cranky and crying. He further related that he became distraught because he was tired from working a 12–hour shift and not feeling well. He said he made several attempts to cope with Jarod's crying by comforting him in ways that had been successful in the past. When the appellant woke up again, Jarod was lying on his stomach and still crying. At this point, the appellant said he became anxious and "reacted, then realized what he had done." He said that with Jarod laying on his side and facing him, he checked Jarod's diaper by placing his forearm on the back of Jarod's head and that he used a great deal of force. The appellant said Jarod's cry be-

came weaker after this. The appellant did not tell his wife what had happened after she saw the blood on Jarod's lips. The appellant also told the investigators that he did not have a clear recollection of what he did that night. Before SA Gallegos could obtain more specific information from him, the appellant elected to terminate the interview and never made a written statement.

The evidence established that, with the exception of the common infant conditions of jaundice and thrush, Jarod was a normal 4–week old infant when he was put to bed at approximately 2200 hours on 2 February 1997. However, between that time and early in the morning on 3 February 1997, Jarod suffered life threatening and permanent injuries. Both medical experts agreed that his injuries were the result of severe and forceful trauma to his head that occurred within hours of him being seen in the emergency room at United at 0730 hours that morning. The only individuals with access to him during that time were Mrs. Dimberio and the appellant.

The appellant argues that because both he and his wife had access to Jarod, either of them could have inflicted the trauma. During oral argument, the appellant's counsel boldly asserted that Mrs. Dimberio injured the child during the second feeding that night and that Jarod was rendered unconscious until he started crying at 0530 hours. Appellant's counsel speculated that Mrs. Dimberio did this because she wanted to get back downstairs to be with her friends. This assertion either ignores or significantly misconstrues the evidence of record.

Mrs. Dimberio testified at the court-martial that she did not shake or strike Jarod. Further, the record is devoid of any evidence that she was in a hurry to return to her guests on either occasion that she was upstairs feeding Jarod and putting him to bed. There was also no evidence that the remaining guests were preparing to leave when she went upstairs for the second feeding. The appellant never told investigators that he

---

**2.** The appellant had previously told doctors that he had rolled on Jarod and this is when he began to cry.

noticed any blood or bruises on Jarod when he got into bed with him that night. In fact, the appellant's statement to investigators conflicts with his counsel's assertion during oral argument that Mrs. Dimberio shook Jarod into unconsciousness which lasted until 0530 hours, because the one thing he consistently told investigators was that Jarod was cranky and crying. This made the appellant distraught because he was tired and not feeling well. The appellant did go to sleep but when he awoke, Jarod was still crying and that is when he became anxious and "reacted." Although appellant argues this "reaction" only involved the placing of his forearm on the back of Jarod's head, we find that the change in Jarod's cry, the blood, bruises, scratches, red nose, and the medical evidence, establish that the appellant's "reaction" was far more severe than he was willing to articulate.

The medical experts agreed that pressure to the back of the head did not cause Jarod's serious injuries, nosebleed, or his neck or clavicle to be bruised. None of the appellant's various explanations are consistent with the facts. However, Jarod's crying and appearance at 0530 hours that morning and his rapid deterioration throughout the day does fit with Dr. Wacksman's opinion that the trauma was inflicted at that time. Accordingly, there is sufficient evidence from which the members could find that the appellant committed an aggravated assault against his son by using a force that was likely to produce death or grievous bodily harm. Therefore, the evidence is legally sufficient. Further, we also are convinced of his guilt beyond a reasonable doubt. Article 66(c), UCMJ, 10 U.S.C. § 866(c). The evidence, in its entirety, demonstrates that the appellant's "reaction" was to violently shake Jarod in an effort to stop his crying so the appellant could go back to sleep.

II. Errors Assigned to the Military Judge

a. **Decision to Not Admit the Testimony of Appellant's Expert Concerning Nicole Dimberio's Mental Health Diagnosis.**

The appellant claims he suffered substantial prejudice because the military judge prohibited him from introducing constitutionally required expert evidence concerning his wife's mental health diagnosis, which—appellant avers—was an indispensable element of his defense. He believes this evidence would have shown that his wife had the motive to commit the offense and was the perpetrator. Finally, in partial support of this assertion, the appellant submits that due process demands relaxation of the evidentiary rules concerning experts when they would preclude an accused from introducing evidence essential to his defense.

Background

As found in Part I, the medical evidence established that Jarod's injuries were the result of a violent shaking or a direct blow to the left front of his head. Testimony also indicated that shaken baby syndrome is the result of an acute, abrupt momentary loss of control by a caregiver. A defense witness who investigates child abuse cases testified that shaken baby syndrome was "a very quick, unthought [sic] of reaction to an outside or internal stimulus that is going on with the person." The witness said the reaction could be triggered by anger, frustration or stress but noted that "[p]eople respond to stress in different ways." It is this testimony, combined with Mrs. Dimberio's mental health diagnosis, which is the linchpin for the appellant's contention that his proffered expert testimony should have been admitted.

After reviewing all of Mrs. Dimberio's medical records and examining her, Dr. David A. Sharbo, the defense expert, diagnosed her with a non-specific personality disorder with narcissistic, histrionic, and borderline traits. He also diagnosed her with alcohol dependence in partial remission and an eating disorder in remission. In his memorandum to appellant's trial defense counsel, he defined each of the traits and noted she had a history of poor impulse control and self-destructive behavior. Dr. Sharbo also opined, without further explanation, that she would not be "expected" to handle stressful situations well. Trial defense counsel used

Dr. Sharbo's memorandum as the sole evidence in support of his proffer on the admissibility of this expert testimony.[3]

The military judge ruled that,

There is zero evidence that when she gets in a stressful situation that she acts out violently and it would be necessary in the court's opinion for you to have that connection or have that opinion in order to solicit this information. The fact that Nicole Dimberio may very well have had or yelled at somebody, for instance, under a stressful situation, that is not a child and not a baby specifically, I would suggest and should be excluded under any type of 403 balancing test. I don't at all when I look at these conditions or these traits—what I want to do for the purpose and I am for the purpose of this ruling assuming that everything that is put forth in pages 3 and 4 of Appellate Exhibit XXXV, Dr. Sharbo would be willing to testify to. I, quite frankly, see Nicole Dimberio, based on simply what I have heard in the courtroom, as certainly someone who meets a number of these characteristics; that she doesn't handle stressful situations well is pretty evident from listening to the testimony in terms of her reaction. But, what you are missing, in the court's opinion, is the connection between stressful situations and violence or the impulsivety [sic] and violence.... I would say that even so, that impulsivety [sic] that results in a number of different behaviors—there is no evidence that that impulsivety [sic] results in violent behavior against a child. In fact, the evidence in this particular case has— all of the evidence that has been presented is the exact opposite. There is certainly evidence that she had access to the baby. I am not disputing that. I think that will come out before the court, or has, and certainly you are permitted to argue that she is an alternate perpetrator. But, to suggest because she has a number of different behavioral characteristics that you can then extrapolate those into some irrelevant testimony I am not going to allow. At this point anyway I am not going to allow it.

**3.** Our review of all of Mrs. Dimberio's medical records that were sealed by order of the military judge reveals there is no evidence that she ever

### Discussion

Mil.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■■■ "Expert testimony is admissible if it is relevant (Mil.R.Evid. 401–02), if its probative value outweighs its prejudicial value (Mil.R.Evid. 403), and if the testimony will assist the trier of fact (Mil.R.Evid. 702)." *United States v. St. Jean,* 45 M.J. 435, 444 (1996). The proponent of the evidence has the burden to establish (A) the qualifications of the expert, (B) the subject matter of the expert testimony, (C) the basis for the expert testimony, (D) the legal relevance of the evidence, (E) the reliability of the evidence, and (F) whether the "probative value" outweighs the other considerations. *United States v. Houser,* 36 M.J. 392, 397 (C.M.A.1993) (citations omitted).

■■■ We review a military judge's decision to exclude expert evidence for an abuse of discretion based upon the record of each case. *United States v. Brown,* 49 M.J. 448, 456 (1998); *Houser,* 36 M.J. at 397. Although the military judge did not specifically frame his evaluation of the proffered testimony in terms of the six criteria cited in *Houser,* it is clear from the record of trial that he was conducting his analysis along those lines. Therefore, we still deem it appropriate to apply the abuse of discretion standard of review. The military judge commits error in excluding expert testimony only if his or her ruling is manifestly erroneous. *United States v. Rivers,* 49 M.J. 434 (1998) (citing *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). If we determine the military judge erroneously excluded the evidence we must test for prejudice. Article 59(a), UCMJ, 10 U.S.C. § 859(a); *United States v. Garcia,* 44 M.J.

directed physical violence toward any third party while angry or stressed.

27, 30 (1996). The erroneous exclusion of defense evidence results in constitutional error only when it is shown that the evidence was material or vital to the appellant's case. *Garcia*, 44 M.J. at 31 (citations omitted).

The fatal deficiency in trial defense counsel's proffer·is that any reasonable reading of the record in the instant case reflects that Dr. Sharbo's testimony was proffered solely to show that Mrs. Dimberio has a personality disorder, for which two of the traits are impulsiveness and poor ability to cope with stress, in order to show that she was predisposed to act, or in this case, react, in a specific manner. It is painfully obvious from the early stages of litigating this issue in the Article 39(a), UCMJ, session, that trial defense counsel's own averments in support of the proffer demonstrated the inappropriateness of admitting the evidence. While disavowing that he was seeking to admit so called profile evidence, trial defense counsel stated:

> Your Honor, I would contend that that is not profile evidence *but is character evidence. This is this particular person's character.....* What the experts will testify is that the nature of this crime is anger/stress related induced trauma by the care giver and then when we are talking about two potential perpetrators here, this person or that person, that specific instance, their character for peacefulness or violence or anger/stress, or whatever you want to call it is relevant to be brought in and argued to the jury—and argued to the jury who is the likely perpetrator here; not evidence from an expert as to profile evidence of child abusers or anything like that. It has to do with the nature of the induced trauma and I just wanted to put that on the record. *We don't intend to get into specific acts at all with any of these witnesses.*

(Emphasis added).

\* \* \*

We have to show the link between the state of mind of Mrs. Dimberio through her personality traits that she has an im-

pulsive personality trait that causes her to act without thinking which fits in perfectly with the testimony of the prosecution's own expert witness who said that is exactly what happens in this particular situation; that because of stress related factors caused by whatever it may be—internally or externally, whatever may be going on in that person's head at that time.

Trial counsel's position was:

> [T]here is nothing in [Dr. Sharbo's] opinion that in anyway relates in any fashion to any type of violence, any type of maltreatment of children, any type of neglect of children, anything that would relate at all to her past history with children, anything that would relate to her past history with other people. Impulsivety [sic] could mean that she likes shoes. It could mean that she likes to shop or it could mean a number of different things.

The military judge did not question Dr. Sharbo's qualifications nor the subject matter or basis for his testimony. *See, e.g., United States v. Blaney*, 50 M.J. 533 (A.F.Ct.Crim. App.1999), *pet. denied,* — M.J. —— (1999). The sticking point for the military judge was the legal relevance of the testimony about Mrs. Dimberio's diagnosis and the behavioral traits associated with it. Further, while the military judge's reliance on the fact that there was no evidence that Mrs. Dimberio had ever assaulted an infant may have been overly narrow in scope, this does not detract from the essential correctness of his ruling.

Trial defense counsel's contention that the proffered evidence was admissible "to show the link between the state of mind of Mrs. Dimberio" confuses a diagnosed mental condition for the required "state of mind" issue addressed by Mil.R.Evid. 404(b).[4] The state of mind on which Mil.R.Evid. 404(b) allows extrinsic evidence of other wrongs or acts to establish, where relevant, is consciousness of guilt, intent, or absence of mistake or accident. *Id.* The existence of a particular mental condition or character trait does not, *per se*, equate to evidence of a guilty state of

---

**4.** (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, howev-

er, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

mind. Further, even if trial defense counsel's proffer had included specific acts, neither Mrs. Dimberio nor the appellant claimed they accidentally injured Jarod, as both denied injuring him, period. Under these circumstances, the proffered evidence fails to meet the requirements of Mil.R.Evid. 402 and 403.

Appellate defense counsel argues that the military judge abused his discretion because "[i]n regard to a person who had the means and the opportunity to commit the offense, the evidence is relevant to both the motive and the identity of the most likely perpetrator and Mrs. Dimberio's credibility." We disagree.

First, the very foundation which the defense used at trial to argue the relevance of Dr. Sharbo's testimony, that shaken baby injuries are inflicted impulsively and without planning, defeats the prospect of relevancy on the issue of motive. As such, the proffered evidence of a mental health condition or character trait, again fails to make the existence of a fact in issue more or less likely with regards to either motive or identity. Mil.R.Evid. 401. It's noteworthy that Dr. Sharbo was not represented as willing to testify that a person with a histrionic personality was more or less likely to violently shake a baby than one who had worked a 12–hour shift the prior day, was feeling ill, and was presented with a crying baby who couldn't be consoled. Even if minimally within the threshold of Mil.R.Evid. 402 (logical relevance), it doesn't survive Mil.R.Evid. 403 (legal relevance), at least within the facts of the instant case.

Second, as regards appellate defense counsel's averment that the evidence also was relevant on Mrs. Dimberio's credibility, trial defense counsel never asserted the evidence was proffered to impeach Mrs. Dimberio. Further, even if that were the case, the evidence proffered does not meet the criteria for impeachment as it was not in proper form and it is not probative of truthfulness or untruthfulness. *See* Mil.R.Evid. 608. It should be evident at this point that all of these averments repeatedly come full circle to the issue of character or a trait of charac-

ter, which is the Achilles' heel of the appellant's arguments.

■ The critical deficiency of appellant's proffer was its reliance on a predisposition or profile, which in turn depended upon a trait of Mrs. Dimberio's character. This is specifically prohibited by Mil.R.Evid. 404(a), which provides:

> Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:
>
> (3) Character of witness. Evidence of the character of a witness, as provided in Mil.R.Evid. 607, 608, and 609.

We have already determined that the exception of Mil.R.Evid. 404(a)(3) is not an issue. Instead, trial defense counsel attempted to use the proffered expert testimony to avoid the constraints of Mil.R.Evid. 404(a). This is not permitted. *United States v. Garcia*, 25 M.J. 159 (C.M.A.1987) (summary disposition); *United States v. August*, 21 M.J. 363 (C.M.A. 1986). *See also* Stephen A. Saltzburg, et al., 1 *Federal Rules of Evidence Manual*, 379 (7th ed.1998). Evidence which tends to show that the typical perpetrator of a crime possesses certain traits or characteristics and that an accused possesses the same traits or characteristics is generally not admissible because it can confuse and trick the fact finder into reaching a determination based upon an individual's personality instead of what the evidence shows he did. *United States v. Banks*, 36 M.J. 150 (C.M.A.1992).

This is precisely the situation our superior court addressed in *St. Jean* when it said "We note [ ] that there is an enormous difference between asserting that persons who bear certain characteristics are likely to have committed crime, and asserting that persons who manifest particular characteristics are likely to have a certain mental state or condition." *St. Jean*, 45 M.J. at 444 (citations omitted).

■ Accordingly, we hold that, regardless of the party who proffers such evidence, unless the proffered evidence qualifies for one of the three stated exceptions, the prohibition of Mil.R.Evid. 404(a) applies whether

the character or character trait in question is the accused's, a witness', or any other person's, and regardless of whether a witness or other person is alleged to be the perpetrator. *See Banks,* 36 M.J. at 161.

We do not read the rules of evidence or case law as permitting a trial to be decided by traits associated with a personality disorder. The appellant offered no crimes, wrongs, or other acts committed by Mrs. Dimberio to establish any issue relevant to the case. *See* Mil.R.Evid. 404(b). In the end, after carefully analyzing the evidence, the military judge concluded Mrs. Dimberio's personality disorder was not relevant and, therefore, not admissible. Mil.R.Evid. 402, 403. We find the military judge was well within his discretion in reaching that conclusion, as trial defense counsel did not carry his burden of demonstrating the proffered evidence would help the members assess Mrs. Dimberio's testimony or resolve the ultimate issue of guilt or innocence.

**b. Appellant's claim that due process requires the rules of evidence to be relaxed.**

We now address the appellant's contention that the due process clause requires relaxation of the applicable rules of evidence in order that he might present the excluded evidence. Again, we disagree.

The Constitution does not confer upon an accused the right to present any and all types of evidence at trial, but only that evidence which is legally and logically relevant. *United States v. Woolheater,* 40 M.J. 170, 173 (C.M.A.1994) (citing *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *United States v. Kelly,* 39 M.J. 235, 237 (C.M.A.1994)). "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413, (1998) (citing *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038,

35 L.Ed.2d 297 (1973)). Rules that exclude evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* (citations omitted).

In support of the appellant's contention, appellate defense counsel relies on *United States v. Combs,* 35 M.J. 820, 827 (A.F.C.M.R.1992) wherein this Court referred to, and relied in part on, *dicta* in *United States v. Gipson,* 24 M.J. 246 (C.M.A. 1987) to support a finding of prejudice as a result of an erroneous ruling of the military judge. We find counsel's reliance on *Combs* and *Gipson* misplaced for two reasons.

First, our superior court's decision in *Gipson* generated three separate opinions, one of which was a dissent. The concept that due process may demand some relaxing of the rules of evidence where scientific or technical evidence is concerned was expressed solely in the opinion of then Judge Cox, *id.* at 252, but not in the vein which appellate defense counsel ask us to apply it. Before elaborating on this abstract proposition, Judge Cox also said, "there can be no right to present evidence—however much it purports to exonerate an accused—unless it is shown to be relevant and helpful." *Id.* (Opinion of Cox, J.). Read within the context of his entire opinion, however, Judge Cox restricted the *possible* role of due process, for he said "[d]ue process *may* have an impact" to the realm of the military judge's function when applying Mil.R.Evid. 402, 702, and 403. *Id.* at 252 (emphasis added). In other words, the requirements of due process are built into the applicable criteria which the military judge is required to follow in exercising his or her discretion. Further, the key issue in *Gipson* was how a military judge should assess the admissibility of novel or controversial scientific or technical evidence, specifically, polygraph evidence.

Second, is the factual context this Court addressed in *Combs.* The actual basis of this Court's decision in *Combs* was that the military judge erroneously applied a far more liberal standard when evaluating the admissibility of the government's expert wit-

ness' testimony than the one he applied when evaluating the admissibility of the proffered defense expert witness' testimony. This unwarranted double standard was deemed prejudicial because it precluded the appellant from presenting a crucial element of his defense to the fact finder. *Combs,* 35 M.J. at 826–27.

■ The bottom line is that due process does not entitle an accused to the relaxation of the applicable rules of evidence, regardless of the issue on which an accused proffers the evidence in question.[5] Evidence proffered by the accused must meet the same standards of admissibility as those imposed on the prosecution.

■ The appellant's second assertion of constitutional error also fails. First, we have determined that the military judge did not abuse his discretion by excluding Dr. Sharbo's testimony. Second, even had we found an abuse of discretion, and assuming prejudice, it wouldn't have risen to constitutional magnitude. To rise to the level of constitutional error, a ruling must have "infringed upon a weighty [constitutional] interest of the accused." *Scheffer,* 523 U.S. at 309, 118 S.Ct. 1261. For our purposes, the military judge's ruling must have excluded evidence material or vital to the defense. *Garcia,* 44 M.J. at 31 (citations omitted). Further, an accused must have been deprived of the opportunity to present his/her defense to the fact finder. Otherwise, any error in excluding the evidence is an evidentiary error, and is tested for prejudice under the standard for evidentiary error. *Id.*

■ When tested against this standard, it is manifestly clear that the appellant was not deprived of his right to present the defense of an alternate perpetrator. His main defense at trial was that Mrs. Dimberio inflicted the injuries on Jarod. In pursuit of this theory, his counsel established that she had access to Jarod during the period in which the injuries occurred. Through Dr. Garman's testimony, he raised the issue of

whether Mrs. Dimberio was stressed and intoxicated that night. The appellant also showed that she was alone with Jarod for three days while he was out in the field just prior to that weekend. The only area he was not allowed to explore was Mrs. Dimberio's mental health diagnosis. More importantly, the appellant was able to confront Mrs. Dimberio, the individual whom he asserted committed the offense, in court, under oath, via the vital crucible of cross-examination. When these factors are balanced against the exclusion of Dr. Sharbo's proffered, nonspecific testimony about Mrs. Dimberio's mental health diagnosis and his expectation that she would not react well to stress, the appellant's claim that he was denied the ability to present the defense of an alternate perpetrator simply is not in accord with the record of the proceedings.

The military judge neither abused his discretion nor violated the appellant's constitutional right to present a defense. Instead, he correctly determined the proffered expert testimony was not admissible under Mil. R.Evid. 402, 702, and 403. The appellant is entitled to no relief on this issue.

### c. Denial of the Appellant's Challenge for Cause Against Lieutenant Colonel Sawyer.

The appellant argues Lieutenant Colonel (Lt Col) Sawyer's responses during *voir dire* established that he should not have been allowed to sit as a court member because of actual and implied bias. The bases for the challenge were that Lt Col Sawyer had a son with attention deficit disorder and hyperactivity resulting in a developmental delay involving speech, and that his wife had been assaulted by her mother and stepfather when she was a child. According to the appellant, Lt Col Sawyer would not have been fair and impartial during the trial, particularly in sentencing. He relies heavily on *United States v. Daulton,* 45 M.J. 212 (1996). Since appellant exercised his preemptory challenge against Lt Col Sawyer and noted he would

---

5. The rules of evidence in sentencing are relaxed only with regard to the manner by which the evidence is presented to the sentencing authority. The evidence in question still must otherwise satisfy the applicable rules of admissibility. *See* Rule for Courts–Martial 1001(c)(3); Mil.R.Evid. 1101(c).

have used that challenge against another court member, the issue is properly before us for review.

A court member should be removed for cause whenever it appears that the member should not sit "in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." Rule for Courts–Martial (R.C.M.) 912(f)(1)(N). The burden of establishing that grounds for a challenge exist belongs to the party making the challenge. R.C.M. 912(f)(3). Military judges must follow the liberal-grant mandate in ruling on challenges for cause. *United States v. White*, 36 M.J. 284, 287 (C.M.A.1993). An appellate court will overturn a military judge's ruling on a challenge for cause only for a clear abuse of discretion. *Id.* On questions of actual bias, which exists when the member has a personal belief or attitude that will not yield to the evidence and the military judge's instructions on the law, the decisions of the military judge are given great deference. *United States v. Napoleon*, 46 M.J. 279, 283 (1997), *cert. denied*, 522 U.S. 953, 118 S.Ct. 375, 139 L.Ed.2d 292 (1997). *See White*, 36 M.J. at 287. However less "deference" is paid on questions of implied bias, which are reviewed through the eyes of the public using an objective test focusing on the appearance of fairness. *Napoleon*, 46 M.J. at 283. *See Daulton*, 45 M.J. at 217; *United States v. Dale*, 42 M.J. 384 (1995).

In *Daulton*, which involved child sexual abuse, the challenged court member's grandfather had sexually abused her sister and their mother. The abuse occurred when her sister was about the same age as TSgt Daulton's daughters when he abused them. In addition, the challenged court member's responses to the military judge's questions about her ability to distinguish her personal family experience from the accused's court-martial were "less than resounding." *Daulton*, 45 M.J. at 218. In contrast, Lt Col Sawyer did not equivocate in his responses. He indicated that the abuse of his wife had an impact on her and the way she wanted their children to be disciplined. Trial defense counsel asked if Lt Col Sawyer were the accused, would he want someone with his (Lt Col Sawyer's) background imposing punishment. While admitting that he could not know how the appellant felt, Lt Col Sawyer responded that he would not prejudge anything and would require the prosecution to prove the case "beyond a shadow of a doubt." When pressed further by defense counsel whether the situation with his wife or son would have any impact on his ability to adjudge an appropriate sentence, Lt Col Sawyer responded, "[T]he events that we have just discussed will not have any impact on me as to what type of punishment there should be." In denying the challenge the military judge noted that Lt Col Sawyer was "forthright and honest in his demeanor."

Our review of Lt Col Sawyer's responses during *voir dire* demonstrate that there was no basis to sustain a challenge for cause against him grounded upon actual bias. Furthermore, the appellant's reliance on *Daulton*, decided on implied bias, is misplaced. The only similarity in the facts is that both challenged court members were "shocked" to learn that someone they knew had been victimized. Applying the objective test to this situation, we are convinced that a spectator observing Lt Col Sawyer during *voir dire* would not perceive any unfairness in the proceedings as a result of his sitting as a court member. His answers during the group and individual *voir dire* refute any suggestion or appearance that he would not be fair in discharging his duty as a court member. The military judge did not abuse his discretion in denying the challenge for cause against Lt Col Sawyer.

### III. Demand for A New Convening Authority Action

This issue has been resolved adversely to the appellant. *United States v. Owen*, 50 M.J. 629 (A.F.Ct.Crim.App.1998) (en banc).

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the accused occurred. Accordingly, the findings and sentence are

AFFIRMED.

Chief Judge SNYDER and Judge SENANDER concur.