# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, PENLAND, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private First Class GEORGE R. GALVAN**
**United States Army, Appellant**

ARMY 20140320

Headquarters, U.S. Army Intelligence Center of Excellence and Fort Huachuca
Douglas K. Watkins, Military Judge
Colonel Timothy J. Cody, Staff Judge Advocate (pretrial)
Colonel Joseph A. Keeler, Staff Judge Advocate (post-trial)

For Appellant: Colonel Kevin Boyle, JA; Major Amy E. Nieman, JA; Captain Brian D. Andes, JA (on brief).

For Appellee: Colonel Mark H. Sydenham, JA; Major Daniel D. Derner, JA; Captain Steve T. Nam, JA (on brief).

31 March 2016

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

PENLAND, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of one specification of failure to obey a lawful order, one specification of false official statement, two specifications of rape, one specification of larceny, and one specification of adultery, in violation of Articles 92, 107, 120, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 907, 920, 921, and 934 [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge and confinement for two years.

We now review appellant's case under Article 66, UCMJ. We have considered matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); they lack merit.

Appellant assigns two errors, one of which warrants discussion but no relief:

> WHETHER THE MILITARY JUDGE ABUSED HIS
> DISCRETION WHEN HE DENIED THE DEFENSE'S
> FOR CAUSE CHALLENGE OF COLONEL (COL) SK
> "BRINGING IN AN EXPECTATION" THAT "THE
> ARMY HAS A SEXUAL ASSAULT PROBLEM" AND
> THERE "WASN'T A GREAT NUMBER OF FALSE
> REPORTS" OF SEXUAL ASSAULTS.

During group voir dire, trial defense counsel asked about the panel members' attendance at training sessions regarding sexual assault prevention and response. All of the members indicated they had received such training in the previous twelve months. Colonel (COL) SK and several other panel members indicated that in the context of the training they had been briefed on statistics regarding the incidence of false reports. All panel members responded in the negative when asked whether they believed "all or most sexual assault allegations are true" and whether "all or most sexual assault allegations brought to court-martial are true." Then, all panel members responded affirmatively when defense counsel asked: "How many on this panel believe that the Army has a sexual assault problem?"

The defense continued by specifically focusing on the prosecution of sexual assault allegations. All panel members responded negatively when asked: whether they "believe that the Army is not doing enough to prosecute alleged sexual assaults?"; whether they felt "the best thing to do [in response to such an allegation] is to bring that case to trial, so that our Soldiers see that the Army is serious about prosecuting sexual assault?"; and, whether any of them believed acquittal of such a charge would "contribute to the perception that sexual assaults are not taken seriously in the military?"

Defense counsel subsequently followed up on several of these points during individual voir dire with COL SK:

> Q: Sir, one of the questions I had asked when I was
> doing the questioning is, whether folks had some
> knowledge of statistics from trainings about false -- you
> know, how often reports of sexual assault are false and
> you had mentioned you did have some familiarity with
> those statistics. What, if any, statistics have you been
> given regarding how often a report of sexual assault is
> false?
>
> A. Well, I don't remember the specific statistics or
> what the outcome was, but I do remember in part of the

training that we were, let's say, given those statistics.  I don't remember specifically.

Q.  You don't remember them specifically; do you remember if the statistics were one way or the other saying "On average, most sexual assault reports are not false," or "On average, most sexual assault reports are false?"

A.  No.  It wasn't couched in that way.

Q.  Do you remember how it was couched, sir? What they were?

A.  It was just merely statistics that some reports are inaccurate.

Q.  I realize I just asked this to you, sir, but I'm just trying to ask it in different ways to make sure I get at it. Do you feel that there was, even though it wasn't couched in that way, when they gave you those statistics and some reports are inaccurate or false and others are not; do you remember if, specifically, there was some type of talk of "More of these reports are not false" of "More of these reports are true than are false."  Things like that?

A.  No.  I would say probably more than less than.

Q.  Meaning more of the reports are false than are true?

A.  Well, more are on the less side in terms of it wasn't a great number of false reports.

Q.  Okay, so if you can--as you recall the training when they were talking about statistics, there were not a large number of false reports.

A.  Right.

Q.  Any reason to doubt anything you've heard in that training as to whether it's true or not?

A.  No.

Q.  Sir, on one of the questions I asked of everybody and everybody gave an affirmative answer was whether or not you all believe the Army had a sexual assault problem.  You were one of everybody who said "Yes, I believe the Army has a sexual assault problem." Why do you believe that, sir?

A.  Well, I mean it's like anything else.  I've been in the military a long time, since '82, and the same thing with drunk driving.  It started off very small and then the Army had a campaign against the problem to get after and make folks aware that there is a mission.  It's the same thing with sexual assault.  It's the Army trying to get after what they believe is an issue.

Q.  Do you believe that the Army has a sexual assault problem that is different from, say, any college campus anywhere in the United States?  For example, it's more prevalent here than in other places?

A.  Well, I've seen the reports where the Army says it's higher on average than out in the civilian populations.

Q.  So some of the reports you've seen have showed that the Army does actually have a higher rate of sexual assault than out in other populations?

A.  [Affirmative response.]

After the military judge questioned COL SK about his enlisted service as a military policeman, government counsel followed with one question based on those asked by the defense:

Q.  Sir, [defense counsel] asked you about the various reports that you've read as to sex assault maybe being higher in the military than in the civilian world.  If you were to be a panel member on this case, could you put all of that aside and decide this case solely on the facts and the evidence that come before you, and the instructions that are provided by the military judge?

A.  Absolutely, ma'am.

Defense counsel challenged COL SK for cause, arguing *inter alia*:

> Colonel [SK] said he had heard statistics that there are not a large number of false reports of sexual assault and that he has no reason to doubt the truth of those statistics, so he's got a going in position that, on the average, most of those reports of sexual assault are going to be true.

Government counsel opposed the challenge, arguing, *inter alia*:

> He believes that some reports are inaccurate. There were not a large number of false reports. He did say that the reports that [sic] are higher in the Army than with civilians, but that the Army is trying to resolve an issue, like DUI. He also answered Defense's voir dire questions about--in the affirmative, about whether or not someone would lie or embellish things to get what they wanted, as well as if he could envision a situation in which a person might make a false complaint of sexual assault. He was able to put aside his military training as an MP and stated that he would be able to decide this case on the facts and on your instructions.

Denying the defense challenge, the military judge reasoned:

> I've considered the challenge for cause on the basis of both actual and implied bias and the mandate to liberally grant defense challenges. The challenge is denied for the reasons stated by the government, for one . . . .
>
> I'm a little bit troubled by the [sic] trying to make a correlation between the statistics on false complaints which the court doesn't have before it and doesn't have personal knowledge of, and what [sic] a member's belief about what they might be. I understand that the defense might be concerned with their bringing in an expectation but Colonel [SK], specifically, said he could put all of that aside and follow my instructions in this case. He actually said "Absolutely," so that challenge is denied.

Our superior court has established the standard of review in cases such as appellant's:

> "A military judge's ruling on a challenge for cause is reviewed for an abuse of discretion. Military judges are afforded a high degree of deference on rulings involving actual bias. This reflects, among other things, the importance of demeanor in evaluating the credibility of a member's answers during voir dire. By contrast, issues of implied bias are reviewed under a standard less deferential than abuse of discretion, but more deferential than de novo."

*United States v. Woods,* 74 M.J. 238, 243 (C.A.A.F. 2015) (quoting *United States v. Downing,* 56 M.J. 419, 422 (C.A.A.F. 2002)).

"The burden of establishing that grounds for a challenge exist is upon the party making the challenge." *United States v. New*, 55 M.J. 95, 99 (C.A.A.F. 2001) (citing R.C.M. 912(f)(3)); *United States v. Wiesen*, 57 M.J. 48, 49 (C.A.A.F. 2002); *United States v. Rolle*, 53 M.J. 187, 191 (C.A.A.F. 2000); *United States v. Warden*, 51 M.J. 78, 81 (C.A.A.F. 1999); *United States v. Giles*, 48 M.J. 60, 63 (C.A.A.F. 1998). However, "[m]ilitary judges must follow the liberal-grant mandate in ruling on challenges for cause . . . ." *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996) (quoting *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993)); *see also United States v. Wiesen*, 56 M.J. 172 (C.A.A.F. 2001).

"Actual bias is personal bias that will not yield to the military judge's instructions and the evidence presented at trial." *Woods,* 74 M.J. at 243 (quoting *United States v. Nash,* 71 M.J. 83, 88 (C.A.A.F. 2012)). Our evaluation of implied bias has a slightly different focus, based on an "objective test" and "the consideration of the public's perception of fairness in having a particular member as part of the court-martial panel." *Id.* (quoting *United States v. Peters,* 74 M.J. 31, 34 (C.A.A.F. 2015)).

We recognize and certainly agree with the government's statement that "[t]he question . . . is not whether a member has particular views but whether they can put these views aside to evaluate the case on its merits." Appellee's Br. 14 (citing *United States v. Elfayoumi*, 66 M.J. 354, 357 (C.A.A.F. 2008)). However, we must note that the government, in part, incorrectly briefs the facts of this case: "When asked by the trial counsel if he could set aside . . . any prior exposure to SHARP training and statistics about false reports, Colonel SK said he could do so . . . ." Appellee's Br. 16. The government also writes that COL SK "unequivocally stated that he could put aside the statistics on false reports and follow the military judge's instructions." Appellee's Br. 19. In fact, COL SK was not specifically asked by either government counsel or the military judge whether he recognized that such statistics had no bearing on his duties in appellant's case. Nonetheless, trial defense

6

counsel did not ask COL SK whether his exposure to false reporting statistics would somehow diminish his ability to impartially evaluate appellant's case in accordance with the law and evidence. Based on the circumstances, including COL SK's vague recollection of such statistics, we find appellant did not meet his burden to establish that COL SK possessed actual bias.

Turning to the issue of implied bias, we conclude that members of the public would perceive no illegality, unfairness or partiality with COL SK's service as a panel member. *See* R.C.M. 912(f)(1)(N). In making this judgment, we note his disagreement during group voir dire with the propositions that all or most reports of sexual assault are true or that all or most sexual assault allegations which proceed to courts-martial are true. We also note his unequivocal response—"Absolutely, ma'am"—to the question of whether he could set aside the possibility that the Army has a larger incidence of sexual assaults than the civilian community and decide this case solely on the evidence and instructions thereon. We are confident that COL SK's answer was not dependent on any particularized training information to which he was exposed and, instead, represented his ability and willingness to serve as an impartial factfinder, "the *sine qua non* for a fair court-martial." *Wiesen*, 56 M.J. at 174 (quoting *United States v. Modesto*, 43 M.J. 315, 318 (1995)). We find the military judge did not abuse his discretion in denying the challenge for cause, even in light of the liberal grant mandate.

## CONCLUSION

The findings and sentence are AFFIRMED.

Senior Judge HAIGHT and Judge WOLFE concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court