# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

### No. ACM 39512

_____

### UNITED STATES
*Appellee*

**v.**

### Faraz A. WASSAN
Airman (E-2), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 8 May 2020

_____

*Military Judge:* L. Martin Powell.

*Approved sentence:* Dishonorable discharge, confinement for 11 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 20 April 2018 by GCM convened at Eglin Air Force Base, Florida.

*For Appellant:* Major Rodrigo M. Caruço, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Zachary T. West, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire; Justin A. Miller (legal intern).[1]

Before MINK, LEWIS, and D. JOHNSON, *Appellate Military Judges.*

Senior Judge MINK delivered the opinion of the court, in which Judge LEWIS and Judge D. JOHNSON joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

[1] Mr. Miller was at all times supervised by an attorney admitted to practice before this court.

MINK, Senior Judge:

A general court-martial comprised of officer members convicted Appellant, contrary to his pleas, of two specifications of attempted sexual assault of a child and one specification of attempted sexual abuse of a child on divers occasions, each in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for 11 months, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the sentence as adjudged.

Appellant raises seven issues on appeal: (1) whether his conviction is factually and legally sufficient in light of the entrapment defense; (2) whether the military judge erred in denying the Defense's challenge to Major (Maj) JS for cause; (3) whether the military judge erred in precluding the members from considering evidence of the potential impact of Appellant's conviction on his citizenship status; (4) whether the military judge erred in denying the defense motion to compel the production of an expert consultant in forensic linguistics; (5) whether, as applied to Appellant, 10 U.S.C. § 856(b), violates the Eighth Amendment[3] prohibition against cruel and unusual punishment; (6) whether the accumulation of errors during his trial amount to cumulative error; and (7) whether Appellant is entitled to relief for post-trial delay. We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

In May 2017, Appellant, then an 18-year-old male Airman assigned to Eglin Air Force Base (AFB), Florida, posted a personal advertisement on the Casual Encounters section of Craigslist,[4] entitled "Looking for some fun – m4t (Fort Walton Beach)."[5],[6] The advertisement read:

---

[2] Unless otherwise noted, all references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] U.S. CONST. amend. VIII.

[4] Craigslist is an internet website that hosts classified advertisements and discussion forums.

[5] Testimony during Appellant's court-martial described the acronym "m4t" as referring to "man for transsexual or transgender."

[6] This opinion quotes an on-line advertisement, emails and text messages as they appear in the record of trial and without correction.

> Heyy I am 19 and I am military and I am just looking to meet
> and have some fun. I am slim/ 6'1 I am up for anything tonight.
> Email me for pics and send yours with it as well

On 16 June 2017, an individual purporting to be "Molly Turner," a 14-year-old girl living on base with her mother, responded to the advertisement and began an email conversation with Appellant. Unbeknownst to Appellant, "Molly" was in fact Special Agent (SA) MB, an investigator with the Air Force Office of Special Investigations (AFOSI), pretending to be "Molly" as part of an undercover law enforcement operation designed to catch sexual predators targeting children. After the exchange of several emails, Appellant and "Molly" switched from communicating by email to Kik, a cellphone application, and began a conversation through text messaging. During this period, Appellant repeatedly asked "Molly" to send him photographs of herself and to meet him in person. During one of their conversations later in June, "Molly" asked Appellant, "What is m4t[?] is it men 4 teen[?]" Appellant responded, "Yes it is. But some places call it something else too." Their electronic text communications continued for approximately one month, during which Appellant used a variety of graphic terms and explicit language to describe the sexual acts he wanted to perform on "Molly" and have her perform on him. Appellant included in his messages graphic descriptions of how he wanted to and would engage in oral and vaginal sexual intercourse with "Molly."

On 12 July 2017, Appellant, who had turned 19 years old in June, arranged to meet "Molly" at a location on Eglin AFB. Appellant drove to the agreed upon location where he was then apprehended by AFOSI agents.

## II. DISCUSSION

### A. Legal and Factual Sufficiency and Entrapment

Appellant asserts that the evidence for the three offenses of which he was convicted was legally and factually insufficient to overcome the defense of entrapment raised at trial. Appellant points both to inducement by the Government, which took the form of "pursuing him" and "pressure" from "Molly," and to Appellant's lack of predisposition, evidenced by the fact that he did not respond to an advertisement posted by law enforcement, that he did not send "Molly" any sexually explicit photographs, and that he did not bring any sexual paraphernalia when he went to meet "Molly." We are not persuaded that Appellant was entrapped and find his convictions both legally and factually sufficient.

#### 1. Additional Background

Immediately after "Molly" responded to Appellant's Craigslist advertisement on 16 June 2017, Appellant asked her to send him a picture of herself,

and "Molly" responded by telling him that she would be turning 15 years old "in a few months." Appellant responded, "Ohh okay. Send me a pic of you" and asked, "What are you looking for?" "Molly" replied, "Just looking for some1 to teach me and fun ;)" to which Appellant said "Alright I will. Just send me a pic."

Appellant and "Molly" then switched to communicating on Kik and Appellant persisted with his request for "Molly" to send him her picture. In reply, "Molly" told Appellant that she lived on the base in "new housing" with her mother. After "Molly" sent Appellant a photograph that purported to be her entire face showing her smiling with braces on her teeth, Appellant sent "Molly" a photograph of himself and immediately began requesting to meet her. Appellant then asked "Molly" to send him another picture and began to try to persuade "Molly" to meet him for just "15 to 20" minutes initially to "just talk." As "Molly" continued to resist meeting Appellant, their discussion shifted to more general topics such as things they each liked to do, such as going to the beach and playing soccer. After "Molly" noted that Appellant mentioned that he liked to "party," the following exchange occurred:

> [Appellant]: Yeah I do
>
> ["Molly"]: Awesome . . . So like wht kind of stuff do u think u can teach me [smile emoji]
>
> [Appellant]: Anything you want. What do you wanna learn
>
> ["Molly"]: Ugh I hav like no experience besides sum kissing and touching . . . Wht do u like
>
> [Appellant]: That's fine I can teach you whatever you want. We will see in person. And I like anything. I will teach you things that you will love
>
> ["Molly"]: Oh ya? . . . I'd rlly like to kno sum
>
> [Appellant]: Mmmm I will show you in person
>
> ["Molly"]: K

The following day, on 18 June 2017, after some general conversation about their activities in which Appellant described going out to eat with some friends and "Molly" stated that she was "Sittin around the house today is cleaning day lol," Appellant again requested to meet "Molly":

> [Appellant]: Mmm so can we meet tomorrow
>
> ["Molly"]: I'd rlly like to kno what u can teach me first . . . So I can b prepared
>
> [Appellant]: Whatever you want and abutting . . . Anything*

4

["Molly"]: What's ur fav thing?

[Appellant]: I like making out and doing oral

["Molly"]: Thts hot lol . . . Wht is oral?

[Appellant]: Eating a girls p***y and sucking d**k. Oral sex

["Molly"]: [smile emoji] . . . R u a good teacher?

[Appellant]: Yes I can be

["Molly']: Why else do u like?

[Appellant]: A lot of things . . . Can we meet tomorrow

["Molly"]: Def sometime this week . . . I hav a question tho

[Appellant]: What is it

["Molly"]: Will u wear protection?

[Appellant]: Yes I wear protection

As Appellant and "Molly" conversed by text message over the next few days, their conversation mostly focused on setting up a time to meet. On 21 June 2017, "Molly" told Appellant that they could meet the next day because her mother would be at work, so they eventually agreed to meet at 6:00 p.m. on 22 June 2017. However, that meeting never occurred because Appellant had to work late and then went to eat dinner. Appellant and "Molly" continued to send messages back and forth as Appellant pleaded with "Molly" to wait longer for him while he ate and "Molly" complaining about how long she had already been waiting. Finally, after waiting nearly an hour, "Molly" accused Appellant of not being serious about meeting her. The following exchange then occurred:

[Appellant]: Fine whatever you want

["Molly"]: Mayb another day

[Appellant]: I don't think so

["Molly"]: K

Nevertheless, approximately 50 minutes later, Appellant sent "Molly" another series of messages stating, "Can we please meet . . . I'll pick you up no one will see . . . I'll buy you something too if you want."

On 25 June 2017, Appellant told "Molly" that he had left for vacation but would "be back after the 4th of July." They continued to send each other messages during this time. On 29 June 2017, Appellant asked "Molly" whether she had ever had drank alcohol. "Molly" told him that she had not and Appellant told her he drank "hard liquor. Whiskey, scotch, bourbon, vodka etc" and then added, "But I'll give you something soft to start with." It was at this point in

their conversation that "Molly" asked Appellant if "m4t" meant "men 4 teen" and Appellant stated that it did, though some "call it something else too." A few minutes later, the following exchange occurred:

> [Appellant]: Aww baby you're so gorgeous I just wanna hold you kiss you and feel you and feel your sexy body! Lay you down and kiss you everywhere
>
> ["Molly"]: Yeah?
>
> [Appellant]: Yes baby make you feel amazing and so good
>
> ["Molly"]: [smile emoji]
>
> [Appellant]: I'll teach you good and sexy things baby . . . You can feel my d**k and make me so hard for you
>
> ["Molly"]: Thts so hot
>
> [Appellant]: Mmm good babe. You can touch it and grab it. Feel it and see how it's like. And then I'll teach you to s**k it good baby . . . Have you ever felt a d**k?
>
> ["Molly"]: Not rlly [frown emoji]
>
> [Appellant]: Aww babe you can feel mine all you want and touch it. It's all yours. And then I'll teach you how to rub it and then lick it good
>
> ["Molly"]: Wht else do u want 2 do [smile emoji]
>
> [Appellant]: I'll lay you down and then slowly kiss your sexy body and then go down on you and lick your wet p***y. Make you feel like you're in heaven . . . Eat it soo good make you c*m for me
>
> ["Molly"]: [smile emoji with heart eyes] . . . Anything else lol?
>
> [Appellant]: After that I'll come back on top of you and slowly put my d**k inside you and start f***ing you slowly and good. Make you feel my big hard d**k inside you and start f***ing you slowly and good. Make you feel my big hard d**k inside you as I kiss you everywhere. I'll make you moan so loud and yell for me. As you feel me inside you . . . I'll f**k your tight p***y good
>
> ["Molly"]: Wow thts hot . . . [three smile emojis with heart eyes]
>
> [Appellant]: Mmmm baby we can do soo much more . . . It'll be fun . . . You'll be my sexy girl
>
> . . .
>
> [Appellant]: Aww baby would you wanna be my girl?

["Molly"]: Yes [smile emoji] but r u ok w me being 14 . . . I jus don't wanna get in trbl

[Appellant]: You won't baby . . . When is your bday?

["Molly"]: Soon n august

[Appellant]: Aww okay babe . . . Goodnight and sweet dreams

As their conversation continued, Appellant told "Molly" that he was now 19 years old. "Molly" did not respond to this message until 10 July 2017, when she told Appellant that she had gone on vacation with her mother to Alabama. Appellant and "Molly" then resumed communicating on Kik and Appellant again requested the pictures of "Molly" that she had sent him previously or "some new ones if you want," stating that his "conversations were deleted." As they again continued to try and set up a time to meet, they finally agreed to 5:15 p.m. on 12 July 2017 at the Bay View Club on Eglin AFB. When Appellant arrived at the agreed upon meeting site, he was apprehended by AFOSI agents.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "Beyond a reasonable doubt" does not mean that the evidence must be free from conflict. *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element

beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

With respect to the affirmative defense of entrapment, Rule for Courts-Martial (R.C.M.) 916(g) states: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." The defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). Once raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense . . . ." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.* (citations omitted).

"Inducement" means more than merely providing the appellant the means or opportunity to commit a crime. *United States v. Howell*, 36 M.J. 354, 360 (C.M.A. 1993). Instead, the Government's conduct must:

> create[ ] a substantial risk that an undisposed person or otherwise law abiding citizen would commit the offense. Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Id.* at 359–60 (emphasis, internal quotation marks and citations omitted).

The Government may use undercover agents and informants to ferret out crime and afford opportunities or facilities for criminals to act upon without implicating the defense of entrapment. *Jacobson v. United States*, 503 U.S. 540, 548 (1992); *see also Howell*, 36 M.J. at 358; *Whittle*, 34 M.J. at 208. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932) (citations omitted); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973). For example, law enforcement officers may pretend to be someone other than a government agent. *See Howell*, 36 M.J. at 358.

In order to find Appellant guilty of an attempt offense under Article 80, UCMJ, the Government was required to prove beyond a reasonable doubt that he did a certain overt act, that the act was done with the specific intent to commit a certain offense, that the act amounted to more than mere preparation, and that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (*MCM*), pt. IV, ¶ 4.b.

Proof that the attempted offenses actually occurred or were completed by Appellant was not required. *See United States v. Church*, 29 M.J. 679, 686 (A.F.C.M.R. 1989), *aff'd*, 32 M.J. 70 (C.M.A. 1991); *see also United States v. Talkington*, No. ACM 37785, 2013 CCA LEXIS 357, at *10 (A.F. Ct. Crim. App. 26 Apr. 2013) (unpub. op.), *aff'd*, 73 M.J. 212 (C.A.A.F. 2014). However, at the time of the acts, Appellant must have intended every element of the attempted offenses. Therefore, in order for Appellant to be found guilty of the attempted offense of sexual assault of a child as alleged in Specification 1 of the Charge, the Government was required to prove beyond a reasonable doubt that Appellant intended to commit a sexual act upon "Molly" by causing his penis to penetrate her vulva, and that at the time of the sexual act "Molly" had attained the age of 12 years but had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 45b.b.(3)(a). Similarly, in order for Appellant to be found guilty of the attempted offense of sexual assault of a child as alleged in Specification 2 of the Charge, the Government was required to prove beyond a reasonable doubt that Appellant intended to commit a sexual act upon "Molly" by causing his penis to penetrate her mouth, and that at the time of the sexual act "Molly" had attained the age of 12 years but had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 45b.b.(3)(a).

In order for Appellant to be found guilty of the attempted offense of sexual abuse of a child on divers occasions by committing lewd acts upon a child who had not attained the age of 16 years, as alleged in Specification 3 of the Charge, the Government was required to prove beyond a reasonable doubt that Appellant committed a lewd act upon "Molly" by communicating indecent language, to wit: explicit descriptions of sexual acts; that at the time "Molly" had not attained the age of 16 years; and that Appellant did so with an intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 45b.b.(4)(d).

### 3. Analysis

At the close of the findings portion of the court-martial, the military judge found a sufficient basis to instruct the court members that "[t]he evidence has raised the issue of entrapment in relation to each of the charged offenses," and "[i]n order to find [Appellant] guilty, you must be convinced beyond a reasonable doubt that [Appellant] was not entrapped." In other words, the absence of entrapment essentially became part of the case the Government had to prove beyond a reasonable doubt in order to secure a conviction.

We are satisfied beyond a reasonable doubt Appellant was not entrapped. An accused who commits an offense without an extraordinary inducement from a Government agent to do so demonstrates a predisposition to commit the offense, and is not the victim of entrapment. *Whittle*, 34 M.J. at 208 (citations

omitted). "Extraordinary inducement" requires more than simply being presented with the opportunity to commit the crime. *See id.* at 209 (citations omitted).

Beginning with the email response from SA MB, posing as "Molly," to the advertisement Appellant posted on Craigslist and the Kik messages that ensued, the Government presented the *opportunity* for Appellant to commit the offenses of which he was convicted. At the outset of their correspondence, "Molly" informed Appellant that she was 14 years old, but Appellant then chose to respond to and continue to engage in a series of messages with her for approximately one month even though "Molly" repeated that she was 14 years old on two other occasions. Despite vague and flirtatious messages by both Appellant and "Molly," it was Appellant who initiated the sexual conversation through the use of explicit and graphic sexual terms. "Molly" did not initiate sexually explicit conversations, nor did she request any sexually explicit images, nor did she coerce or threaten Appellant into any course of action. It was Appellant, not "Molly," who repeatedly tried to convince "Molly" to meet him and who, on 12 July 2017, drove to meet her in person. *See Sorrells v. United States*, 287 U.S. at 441 ("It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution.").

Appellant now claims inducement because "the idea to engage in sexual conversation and ultimately travel to lodging [the location of their scheduled meeting on 12 July 2017] originated with SA MB" and that SA MB continued to "flirt" with Appellant by calling Appellant "hot" and saying that "Molly" liked "trying new things." Appellant further claims that it was SA MB who continued to try and lead the conversation towards "sexual activity" when Appellant "was not taking the bait." Appellant contends that SA MB engaged in a "significant amount of prompting" and played on the "weakness of an innocent party." We disagree. Although inducement "may take different forms, including pressure . . . persuasion . . . threats, coercive tactics, harassment, [and] promises of reward," Appellant was induced only if the Government created "a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *Howell*, 36 M.J. at 359–60 (emphasis, internal quotation marks and citations omitted).

The Government's actions in Appellant's case did not create such a risk and did not constitute inducement. Appellant was very much not the "unwary innocent" to be protected from Government inducement. *Id.* at 358 (citations omitted). Appellant was the one who posted the advertisement on a website where individuals are often looking for casual sexual encounters, as SA MB testified during the trial. Despite trial defense counsel insisting during the trial that the advertisement was targeted towards transgender individuals,

Appellant did not hesitate to continue messaging "Molly" after she told him that she was a 14-year-old girl living on base with her mother. Instead, he immediately and repeatedly asked her for her picture. After "Molly" provided a picture, Appellant then repeatedly and persistently pleaded with her to set up a meeting with him. When their first scheduled meeting did not occur and Appellant indicated that he did not think they should try to meet again, within one hour Appellant re-initiated contact with "Molly" begging her again to meet him and offering to buy her "something." When he eventually got his wish of a scheduled meeting with "Molly," Appellant showed up intending to engage in oral and vaginal sex with her. Despite Appellant's characterizations, none of the Government's actions rose to the level of inducement.

Appellant next claims that at trial the "only evidence presented showed a complete lack of predisposition" to commit any of the charged offenses. Appellant points out that he did not respond to an advertisement posted by SA MB, did not send any sexually explicit photographs or request any, and did not travel to the meeting location with any "paraphernalia showing he intended to engage in sexual activity." Appellant also asserts none of the digital evidence provided any reasonable evidence of a predisposition to engage in sexual activity with minors, but only an interest in legal, adult pornography and interests consistent with Appellant's sexual orientation.

We conclude that Appellant demonstrated a predisposition to commit the three convicted offenses, all of which he committed "without being offered extraordinary inducements." *Whittle*, 34 M.J. at 208 (citations omitted). While it is true that SA MB responded to Appellant's advertisement rather than vice versa, it was Appellant who posted the advertisement, purporting to seek a response from a transgender individual, and it was Appellant who decided to continue to message "Molly" after she told him that she was a 14-year-old girl. Neither the absence of any request for or transmission of sexually explicit photographs nor Appellant's failure to bring any sexually-related paraphernalia to his meeting with "Molly" are dispositive as to whether Appellant was predisposed to attempt to sexually assault a child or engage in sexual abuse of a child. Similarly, child pornography and contact with children are not necessary precursors to or prerequisites for someone to engage in attempted sexual assault or sexual abuse of a child. As described above, Appellant took the initiative to commit the offenses. By doing so, he demonstrated his predisposition.

Finding beyond a reasonable doubt that the Government did not induce Appellant to commit the three offenses of which he was convicted and that Appellant was predisposed to commit all three, we conclude there was no entrapment. Having considered the evidence produced at trial in the light most fa-

vorable to the Government, we also conclude that the evidence was legally sufficient for the court members to find that the Government proved beyond a reasonable doubt that Appellant was not entrapped.

Having decided there was no entrapment, we next consider whether the evidence is legally and factually sufficient to support the findings of guilt on the Charge and its three specifications. Appellant posted an advertisement seeking a sexual encounter to which "Molly" replied. Even after "Molly" told Appellant that she was a 14-year-old child living on base with her mother, Appellant decided to continue messaging her, asking for her picture, and in less than one month, pleading with her to meet him approximately 18 times, even after she told him on two other occasions that she was only 14 years old. In response to vague and flirtatious messages from "Molly," Appellant initiated a sexually graphic conversation with her, eventually describing, in graphic terms, the sexual acts that Appellant wanted to perform on "Molly" and the acts he wanted her to perform on him. The Kik messages Appellant wrote to "Molly" constituted his offense of attempting to commit a lewd act on "Molly" by communicating indecent language to her on at least two occasions on how he wanted to engage in oral and vaginal sex with her. In his 29 June 2017 Kik messages, Appellant articulated his desires to penetrate "Molly's" vulva and mouth with his penis. Then on 12 July 2017, Appellant did the act of going to the location where "Molly" agreed to meet him, intending to engage in oral and vaginal sex with a 14-year-old girl.

In assessing legal sufficiency, we are limited to the evidence produced at trial and required to consider it in the light most favorable to the Prosecution. The bulk of the evidence produced at trial consisted of Appellant's own words in the form of the Kik messages he sent "Molly." While not all the evidence was free from conflict, it did not have to be. *See Wheeler*, 76 M.J. at 568 (citation omitted). We conclude that a reasonable factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's three convicted offenses: attempted sexual assault of a child, to wit: penetration of the child's vulva and mouth with his penis; and attempted sexual abuse of a child on divers occasions by committing lewd acts, to wit: communicating sexually explicit language to the child. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction of the Charge and its specifications is both legally and factually sufficient.

**B. Denial of Challenge for Cause for Implied Bias**

Appellant asserts the military judge erred by denying the Defense's challenge for cause for implied bias against Maj JS, one of the members of Appellant's court-martial. We disagree.

### 1. Additional Background

Prior to trial, the prospective court members completed a Court-Martial Member Information Questionnaire in which they each answered a series of questions. In his questionnaire, Maj JS indicated that a military member he knew at a previous assignment, approximately ten years earlier, had been arrested for setting up a meeting with a minor. In response to a question regarding his feelings or impressions of that event, Maj JS stated that "[t]he member should not have been contracting [sic] someone he believed to be underage, therefore he should have been arrest [sic] and held accountable."

During individual voir dire, Maj JS was questioned further by trial counsel regarding the military member he knew at the previous assignment who had been arrested. Maj JS described the individual as "just another Lieutenant in the squadron" with whom his interactions were "more work-related" than as somebody he considered a friend. Maj JS explained that his knowledge of the situation with the lieutenant was that he "just heard that it had happened and some of the details that were very similar to what you would see on *To Catch a Predator*." Maj JS stated he did not know whether the lieutenant was court-martialed, the outcome of the case, or whether the lieutenant was still in the Air Force. Maj JS stated that he had no concern about being able to disregard that situation and decide Appellant's case on the evidence presented and the instructions from the military judge.

Trial defense counsel asked Maj JS about his father and his relationship with his father. Maj JS stated his father retired from the Air Force in 1981 after serving in then-Security Police since 1961. Maj JS stated he thought his father had worked only as a guard and not as an investigator or inspector. Trial defense counsel also asked Maj JS about his Court-Martial Member Questionnaire response regarding the lieutenant, specifically what Maj JS meant when he said that the lieutenant should have been arrested and "held accountable." Maj JS stated that from what he understood, the lieutenant had sent "pictures of his genitalia to someone that he—it made it sound like he knew was underage, and then set up a meeting with that individual." Maj JS said that if that was true, he thought he should be arrested and that when he said "held accountable," he meant that the lieutenant "would have to go to trial and all the evidence would come out as far as whether he was guilty or innocent." Trial defense counsel then asked if someone would be "held accountable" if found to be "not guilty." Maj JS answered that "yes, they were held accountable for their actions, and those actions were deemed not to be illegal or not sufficient to be illegal."

Trial defense counsel also asked Maj JS about his familiarity with the Casual Encounters section of Craigslist. Maj JS responded that he had seen a recent news article about legislation intended to hold "a lot of these casual encounter websites" accountable in connection with human trafficking.

The military judge then questioned Maj JS about any impact his knowledge of the lieutenant's case would have on Maj JS's consideration of Appellant's case and whether Maj JS would presume that Appellant was not guilty until he had heard all the evidence and had a chance to deliberate. Maj JS said that he would. The military judge also asked Maj JS about his use of the phrase "held accountable" and Maj JS stated that he meant "the process of being in court" and that he was not implying that there was going to be some negative repercussion for what someone had done. The military judge asked Maj JS whether he had any prejudice towards people who used the Casual Encounter websites for consensual and legal relationships. Maj JS stated that he did not have any issue with that as long as it was legal.

Trial defense counsel challenged Maj JS for cause based on implied bias asserting that Maj JS maintained a close relationship with his father, who had worked in law enforcement for a certain period of time, that Maj JS was aware that the Casual Encounters Section of Craigslist had been shut down based on legislation resulting from information that the website had been used to exploit children, and Maj JS's knowledge of the lieutenant in his unit that was involved in a similar case. The military judge denied the challenge for cause addressing each of the bases raised by trial defense counsel and recognizing the liberal grant mandate for defense challenges. The military judge made the following ruling on the record:

> All right. I am going to deny the challenge for cause against [Maj JS]. I don't find the fact that his father was security police back in the [Strategic Air Command] days guarding planes has any bearing really on my determination on [Maj JS]. There is no indication that his father engaged in any law enforcement activities that would even remotely cause me concern.[7]
>
> With respect to his knowledge of Craigslist being shut down as I pointed out, that's in the news. I've seen multiple stories in the news about that. So, it's not surprising to me that somebody might be aware of that. When asked about it, he specifically said as long as people are using those sites for legal things, he had no

---

[7] On appeal, Appellant does not raise Maj JS's relationship with his father as a basis for implied bias. We have reviewed the record and find that the military judge did not err in denying the challenge for cause on this basis.

problem with it. So, he didn't assume that everybody who was going to Craigslist or Back Page was using it for illegal things.

With respect to the Lieutenant, I recall that he said that he didn't make any assumptions about the guilt of the Lieutenant, but ultimately I think it's understandable that that if somebody hears that somebody they know was trying to engage in sexual acts with the minor, including sending a picture of their genitalia, that person might think that being arrested and being held accountable would be appropriate if that's all you knew were the allegations. He admits that he doesn't know what happened in the case, and he agreed that he didn't make any assumptions about guilt. So, I don't think his responses to any of those questions raise any significant concern. I mean, I don't think it is unusual that somebody would say if they hear just the basic facts of what the allegations are that a person—I think it's not unusual that a person would say, okay, that person should be held accountable just based on what I've heard when all I've heard is limited information. So, I don't find that any objective person would have any substantial doubt or really any doubt about the fairness of this court-martial proceeding if [Maj JS] were to remain on the panel. Even applying the liberal grant mandate, I don't think this is particularly close. I don't think [Maj JS] is going to have any problems serving as a fair, impartial and unbiased member of this panel, and I think any reasonable member of the public would see it the same way. So, I am going to deny that challenge for cause.

### 2. Law

Rule for Courts-Martial 912(f)(1)(N) provides that a member shall be excused for cause whenever it appears that the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness and impartiality."

Implied bias is "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007)). Therefore, appellate courts employ an objective standard when reviewing a military judge's decision regarding implied bias. *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004). "The hypothetical 'public' is assumed to be familiar with the military justice system." *Id.* (citing *United States v. Downing*, 56 M.J. 419, 423 (C.A.A.F. 2002)). "In reaching a determination of whether there is implied bias . . . the totality of the circumstances should be considered." *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016) (alteration in original) (internal

quotation marks omitted) (quoting *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015)).

In *Rogers*, the United States Court of Appeals for the Armed Forces further stated:

> "This Court's standard of review on a challenge for cause premised on implied bias is less deferential than abuse of discretion, but more deferential than de novo review." Under this standard, "[w]e do not expect record dissertations but, rather, a clear signal that the military judge applied the right law." Indeed, "where the military judge places on the record his analysis and application of the law to the facts, deference is surely warranted." As we have previously made clear, however, "[w]e will afford a military judge less deference if an analysis of the implied bias challenge on the record is not provided." In cases where less deference is accorded, the analysis logically moves more towards a de novo standard of review.

75 M.J. at 273 (alterations in original)(citations omitted).

In reviewing challenges for cause under the implied bias standard, military judges are required to follow the "liberal grant" mandate, which "supports the UCMJ's interest in ensuring that members of the military have their guilt and innocence determined 'by a jury composed of individuals with a fair and open mind.'" *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005) (quoting *United States v. Smart*, 21 M.J. 15, 18 (C.M.A. 1985)). "[M]ilitary judges must follow the liberal-grant mandate in ruling on challenges for cause, but we will not overturn the military judge's determination not to grant a challenge except for a clear abuse of discretion in applying the liberal-grant mandate." *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993). "[I]n the absence of actual bias, where a military judge considers a challenge based on implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed by rare." *Clay*, 64 M.J. at 277.

### 3. Analysis

Having reviewed all of the questions posed to Maj JS in the pretrial questionnaire and during voir dire and each of his answers, we conclude the military judge did not abuse his discretion in denying the Defense's challenge for cause against Maj JS. Appellant asserts that Maj JS expressed views demonstrating a predisposition towards guilt and that the military judge's failure to grant the challenge for cause resulted in the objective appearance of unfairness in the proceedings. We disagree.

Maj JS thoroughly answered each of the questions posed by trial counsel, trial defense counsel, and the military judge. Maj JS described his limited knowledge of the lieutenant's case, which had occurred approximately ten years earlier. He did not know the outcome of the case and consequently expressed no opinion regarding its outcome. Maj JS also clearly described his nonstandard usage of the term "held accountable" as not meaning "presumed guilty" and acknowledged it as "maybe a bad choice of words."

With respect to Maj JS's awareness of legislation regarding the Casual Encounters section of Craigslist, he explained what he had read in the media, and there was no indication that media coverage had any connection to Appellant's case whatsoever. As we have noted in prior opinions, military members are expected to stay informed about current events, and absent a more specific connection to Appellant's trial Maj JS's awareness of those events do not disqualify him from serving as a court-martial member.[8]

As quoted in full above, the military judge clearly discussed his analysis and application of the law to the facts in denying the challenge for cause for implied bias. He considered the liberal grant mandate concluding that it was not warranted in this case. Perhaps most significantly, Maj JS stated that he would set aside any of his personal experiences and focus on the evidence produced in Appellant's court-martial, responses which would allay the fears of any objective observer that Maj JS appeared to be biased against Appellant. Based upon the totality of the above factual circumstances in this case, we find no risk that an objective member of the public would perceive Maj JS's participation as a court member as rendering Appellant's trial less than fair.

## C. Sentencing Evidence Regarding Naturalization Status

Appellant asserts that the military judge erred in precluding the court members from considering evidence of the potential impact of Appellant's conviction on his citizenship status. We disagree.

### 1. Additional Background

During presentencing proceedings, Appellant sought to introduce a written unsworn statement with three documents attached: (1) a screenshot of the U.S. Citizenship and Immigration Services Policy Manual, Chapter 7, *Revocation of Naturalization*; (2) an extract from 8 U.S.C. § 1439, entitled *Naturalization through service in the armed forces*; and (3) a Sex Offender Registration Listing

---

[8] *See, e.g.*, *United States v. Bischoff*, 74 M.J. 664 (A.F. Ct. Crim. App. 2015) (knowledge of another trial pertaining to the same type of offense not disqualifying). Even possessing some knowledge of the particular case being tried is not *per se* disqualifying. *See, e.g.*, *United States v. Rockwood*, 52 M.J. 98, 106 (C.A.A.F. 1999) (citation omitted); *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997) (citations omitted).

dated 11 March 2013. The military judge sustained the trial counsel's objection to the three attachments because they did not constitute statements of the Appellant.

Appellant's written unsworn statement, without the three attachments, was admitted as a defense exhibit without further objection. In it, Appellant stated that he joined the Air Force on 6 September 2016 and became a naturalized U.S. citizen in December 2016. Discussing his fears about the future, Appellant stated:

> In the short term, I am terrified about my citizenship. I have reviewed documents from the U.S. Citizenship and Immigration Service, as well as legal references to 8 U.S.C. § 1440(b), and I have learned this court-martial conviction makes me subject to having my naturalization revoked. I have lived in this country—my home—since I was 10 years old. When I became a citizen, I renounced my Pakistani citizenship. I honestly do not know where I will go.

Despite presenting this information in his written unsworn statement without any objection from the Government, Appellant asserts on appeal that because the military judge excluded the attachments, he was essentially forced to take the stand and testify under oath.[9] Appellant testified to essentially the same information he included in his unsworn statement regarding his belief that his "naturalization might be revoked because of this [court-martial]" based on what he had seen "through the U.S. laws and stuff like that."

Trial defense counsel then sought to introduce a separate defense exhibit—a six-page document consisting of an extract of 8 U.S.C. §1440, *Naturalization through active-duty service in the Armed Forces during World War I, World War II, Korean hostilities, or other periods of military hostilities*, and a copy of an article from *Citizen Path* entitled "Expedited Citizenship Through the Military." Trial counsel objected to this exhibit as "a collateral matter" that was "speculative in nature" offered without any evidence that Appellant was subject to the process described therein and questioned "how this would apply in

---

[9] Despite Appellant's assertion, we are not persuaded that the military judge's ruling "virtually eliminated" Appellant's right to decide whether to provide sworn testimony. Appellant had the right to testify under oath if he chose to do so. Under R.C.M. 1001(c)(2)(C), Appellant also had the right to deliver an oral unsworn statement in addition to his written unsworn statement. Our review of the record does not convince us that Appellant was compelled in some way to testify under oath. In fact, the substance of Appellant's sworn testimony was essentially the same as the information contained in his written unsworn statement.

practice" to Appellant. Trial counsel also asserted that it failed the Mil. R. Evid. 403 balancing test.

Relying on the decisions in *United States v. Talkington*, 73 M.J. 212 (C.A.A.F. 2014), and *United States v. Bedania*, 12 M.J. 373 (C.M.A. 1982), the military judge found that the issue of any possible impact on Appellant's naturalization status constituted a collateral matter. The military judge also concluded that the "document does not require that [Appellant] be deported or his naturalization be revoked" and that there is "insufficient evidence that this statute even applies in this circumstance." The military judge then provided his analysis under Mil. R. Evid. 403 on the record:

> I do find that the relevance—in light of the uncertainties is substantially outweighed by the danger of confusion of the issues from the members. The members are going to have all the same questions trial counsel has and that I have with regard to how this works, is it mandatory, and ultimately, since it is a collateral matter, I find that it's not admissible under [Mil. R. Evid.] 403 as well.

The trial counsel requested and the military judge provided an instruction to the court members that collateral consequences should not be a part of their deliberations when deciding an appropriate sentence. However, trial defense counsel was permitted to argue the possible impact to Appellant's citizenship status during sentencing argument without objection from the trial counsel.

**2. Law**

We review a military judge's decision to admit or exclude sentencing evidence for an abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citation omitted).

A court-martial is "to concern [itself] with the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration." *United States v. Griffin*, 25 M.J. 423, 424 (C.M.A. 1988). "A collateral consequence is '[a] penalty for committing a crime, in addition to the penalties included in the criminal sentence.'" *Talkington*, 73 M.J. at 215 (alteration in original) (internal quotation marks and citations omitted).

Sentencing evidence, like all other evidence, is subject to the balancing test of Mil. R. Evid. 403. *Manns*, 54 M.J. at 166. A military judge enjoys "wide discretion" in applying Mil. R. Evid. 403. *Id.* When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned

unless there is a "clear abuse of discretion." *Id*. A military judge abuses his discretion when (1) the findings of fact upon which he bases his ruling are not supported by the evidence of record; (2) he uses incorrect legal principles; or (3) his application of the correct legal principles to the facts is clearly unreasonable. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

### 3. Analysis

Despite Appellant's assertions to the contrary, the military judge did not err by excluding the attachments to Appellant's unsworn statement. The plain language of R.C.M. 1001(c)(2)(C) permits an unsworn statement given "by the accused," his counsel, or both. The documents Appellant sought to attach to his unsworn statement are neither a statement by Appellant nor by counsel on his behalf. *See, e.g.*, *United States v. Daniels*, 2014 CCA LEXIS 769 (A.F. Ct. Crim. App. 2014) (unpub. op.) (in which this court upheld a military judge's decision to exclude a statement not written by the appellant from the unsworn statement). Moreover, consistent with R.C.M. 1001(c), the military judge did not preclude Appellant from commenting on his concerns about the impact of the court-martial on his citizenship status and his fear of being deported, which Appellant brought to the attention of the members both in his sworn testimony and in his written unsworn statement that the military judge admitted as a defense exhibit. We conclude that the military judge did not abuse his discretion by excluding the documents attached to Appellant's unsworn statement.

As discussed above, the military judge held that any potential impact of Appellant's sentence on his naturalization status was a collateral matter, relying on the decision of our superior court in *Talkington* and the decision of their predecessor court in *Bedania*. While not addressing the court's holding in *Bedania* that an issue like deportation is a collateral matter, Appellant asserts that the military judge misapplied the decision in *Talkington*. Appellant argues that impact on his naturalization is akin to the impact on retirement benefits addressed in *Talkington* and that the military judge improperly restricted Appellant from addressing matters that could result from "the *sentence itself*, as opposed to the *conviction*." *See Talkington*, 73 M.J. at 217. We are not persuaded.

We do not agree that the deprivation of military retirement benefits resulting from a punitive discharge addressed in *Talkington* is at all analogous to the speculative impact of a dishonorable discharge on Appellant's naturalization status. The evidence before the military judge did not establish that Appellant had even received his citizenship as a result of his military service such that he would be subject to having his citizenship revoked, thereby making him eligible for deportation. Consequently, Appellant's citizenship status constituted a collateral matter. Further, the distinction between the impact "from

the sentence itself as opposed to the conviction" argued by Appellant is a distinction without a difference. In Appellant's case, any potential impact to his citizenship status was a consequence of the mandatory dishonorable discharge resulting from his conviction. The court members had no discretion as to whether to impose the dishonorable discharge. The military judge also conducted a proper Mil. R. Evid. 403 balancing test and concluded that any probative value of the evidence was substantially outweighed by a danger of confusing the issues. We find that the military judge did not abuse his discretion by excluding the documents attached to Appellant's unsworn statement. We also find the military judge did not clearly abuse his discretion when he excluded the separate exhibit consisting of documents discussing naturalization through military service under Mil. R. Evid. 403.

Even assuming *arguendo* that the military judge erred by excluding the documents attached to Appellant's unsworn statement and the separate exhibit pertaining to the potential impact of the court-martial on Appellant's naturalization status, Appellant has failed to establish prejudice under the facts of this case. "When there is error in the admission of sentencing evidence, the test for prejudice 'is whether the error substantially influenced the adjudged sentence.'" *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). We consider four factors when determining whether an error had a substantial influence on the sentence: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citations omitted). We find that the balance of these four factors weighs in favor of the Government—the Government's case was strong, though the Defense's case also had strong points; the materiality of the evidence was extremely limited because similar information was presented elsewhere during the Defense's case; and the quality of the evidence was not really in question. In addition, as noted above, the court members were required to impose a dishonorable discharge as a result of Appellant's *conviction*. We conclude that even if the military judge erred by excluding the documents attached to Appellant's written unsworn statement and the separate exhibit discussing naturalization that the error would not have had a substantial influence on the sentence imposed by the court-members.

## D. Denial of Expert Assistance

Appellant contends that the military judge erred by denying the defense motion to compel the appointment of an expert consultant in the field of developmental psychology and linguistics. We disagree.

### 1. Additional Background

On 16 February 2018, the Defense requested the appointment of Dr. GH to serve as an expert in the field of forensic psychology. Specifically, the Defense request stated its primary purposes for using Dr. GH are "(1) to perform a psychosexual assessment of Appellant looking for predisposition to engage in sexual acts with children, and (2) to assess Appellant's psychological vulnerability to being entrapped by law enforcement." On 2 March 2018, the general court-martial convening authority (GCMCA) approved the Defense's request for the appointment of Dr. GH as an expert consultant.

Also on 16 February 2018, the Defense requested the appointment of Dr. MD to serve as an expert consultant in the fields of developmental psychology and linguistics analysis. On 2 March 2018, the GCMCA denied the Defense's request for the appointment of Dr. MD as an expert consultant, concluding that the Defense "failed to show that the production of Dr. [MD] is relevant and necessary to the preparation or presentation of the defense case."

On 19 March 2018, the Defense filed a motion to compel the Government to appoint an expert in the field of developmental psychology and linguistics, which the Government opposed. On 16 April 2018, after considering the extensive filings of the parties, the military judge denied the motion to compel in a written ruling, concluding that:

> [T]he court finds that the defense has established only a mere possibility that a [sic] Dr. [MD] would provide some level of assistance that could not otherwise be provided by a highly qualified expert in the field of forensic psychology. The court finds that the defense has not met its burden to establish that the denial of the assistance of Dr. [MD] would result in a fundamentally unfair trial. The court therefore concludes that the defense has failed to meet its burden of demonstrating the necessity of an expert in the field of developmental psychology and linguistics.

Appellant asserts that the military judge misapplied the law in deciding the motion. We disagree.

### 2. Law

We review a military judge's ruling on a motion to compel expert assistance for an abuse of discretion. *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010). "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citing *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)).

This "standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (internal quotation marks and citations omitted). "'When judicial action is taken in a discretionary matter, such action can not [sic] be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors.'" *Ellis*, 68 M.J. at 344 (citing *United States v. Sanchez*, 65 M.J. 145, 148 (C.A.A.F. 2007) (quoting *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993))).

> [S]ervicemembers are entitled to . . . expert assistance when necessary for an adequate defense. The mere possibility of assistance is not sufficient to prevail on the request. Instead, the accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial. To establish the first prong, the accused must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop.

*Freeman*, 65 M.J. at 458 (alteration in original) (internal quotation marks and citations omitted).

### 3. Analysis

Appellant asserts that the military judge held Appellant to a higher standard of proof than required by law to establish that Dr. MD's assistance was necessary and that denial would result in a fundamentally unfair trial. Appellant argues the military judge required the Defense to establish the necessity of expert assistance by a *preponderance of the evidence* rather than by a *reasonable probability*. The basis of this assertion is apparently paragraph 6 of the military judge's written ruling, under the heading "Conclusions of Law," in which he stated: "Fundamental to any motion to compel expert assistance is the duty of the moving party to educate the court, and prove by a preponderance of the evidence that expert assistance is necessary for an adequate defense." While this statement taken alone could create the impression that the military judge held the Defense to a higher standard of proof than required by law, a review of the entirety of military judge's ruling convinces us otherwise.

In his written ruling, the military judge correctly stated that Appellant had the burden of proof on any factual issue necessary to resolve the motion and the standard to prove such issue was by a preponderance of the evidence. The

military judge also correctly noted that Appellant had the burden to establish a reasonable probability that the expert would be of assistance to the Defense and that denial of that assistance would result in a fundamentally unfair trial. Noting that the Defense had requested the appointment of Dr. GH as an expert in forensic psychology and his appointment had been approved, the military judge discussed the ways in which the Defense advocated that Dr. MD's assistance was necessary for the Defense. The military judge found that evidence presented in support of the motion failed to establish that Dr. MD's expert assistance was necessary for an adequate defense and that even though the Defense asserted Dr. GH was unable to provide the same expertise as Dr. MD, the Defense failed to present any evidence to support that contention.

The military judge concluded that the Defense had established "nothing more than the mere possibility" that Dr. MD's assessment of the linguistic aspects of the chat logs between Appellant and "Molly" would lead to "any favorable or even relevant evidence in this case." Moreover, the military judge concluded that the Defense presented no evidence that Dr. GH was "ill-equipped in any way to assist the defense in presenting evidence regarding recidivism or evidence regarding [Appellant]'s susceptibility to manipulation or law enforcement tactics."

The military judge's denial of the motion to compel, captured in his written ruling with findings of fact and conclusions of law, is amply supported by evidence presented on the motion. At trial, the Defense raised and argued that Appellant was entrapped into committing the offenses, which required (1) the Government to prove that Appellant was predisposed to commit the offenses and that he had not been induced to do so and (2) the military judge to instruct the court members on the defense of entrapment. We conclude that the military judge did not abuse his discretion in denying the Defense motion to compel.

## E. Constitutionality of Mandatory Dishonorable Discharge

Appellant next asserts that imposition of a mandatory dishonorable discharge is unconstitutional as applied to him in that it violates the Eighth Amendment prohibition against cruel and unusual punishment. We disagree.

### 1. Law

We review the constitutionality of a statute de novo. *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005) (citations omitted). We also review an allegation of cruel and unusual punishment de novo. *United States v. Pena*, 64 M.J. 259, 265 (C.A.A.F. 2007) (citation omitted).

The sentence of an accused found guilty of attempted sexual assault of a child in violation of Article 80, UCMJ, "must include, at a minimum, dismissal or dishonorable discharge," as applicable. Article 56(b), UCMJ, 10 U.S.C. § 856(b).

### 2. Analysis

The United States Supreme Court has rejected the argument that the Eighth Amendment bars mandatory punishments for adult offenders with the exception of the death penalty. *See Harmelin v. Michigan*, 501 U.S. 957, 994–95 (1991) (upholding mandatory sentence to confinement for life).[10] "There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" *Id.* at 995 (citation omitted); *see also United States v. Curtis*, 44 M.J. 106, 157 (C.A.A.F. 1996) (quoting *Harmelin*, 501 U.S. at 994–95).

Appellant argues that the mandatory dishonorable discharge constitutes constitutionally-prohibited cruel and unusual punishment because of his youth, though not his chronological age of 19 years old. Noting that he is "just barely" above the age of majority of 18 years old, Appellant asserts that the mandatory dishonorable discharge is punishment for a lifetime and is "equivalent to a life sentence." In *United States v. Miller*, 567 U.S. 460 (2012), the Supreme Court stated that that maturity should be considered when sentencing a juvenile offender. Appellant attempts to place himself in the same category as a juvenile offender, i.e., one who has not attained the age of majority. We do not find these circumstances comparable. While a dishonorable discharge may terminate Appellant's military status and remain a lifelong stigma, it does not place him in confinement for life.

An accused does have the right to have his or her sentence determined by "'individualized consideration' . . . 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180–81 (C.M.A. 1959)). This does not prohibit Congress from establishing a minimum (or maximum) punishment for a given offense, as those limits indicate congressional determination of lower and upper limits of punishment appropriate for a given offense. In Appellant's case, while he was still subject to a dishonorable discharge, the members were at liberty to sentence him to confinement ranging from no confinement to 35 years of confinement.[11] That is, even with a mandatory punitive discharge, the sentencing authority had great latitude to make an individualized determination as to an appropriate sentence in Appellant's case.

---

[10] Mandatory life without parole has been rejected for juvenile offenders. *See Miller v. Alabama*, 567 U.S. 460 (2012).

[11] The military judge merged the two attempted sexual assault offenses for the purpose of sentencing, reducing the maximum confinement that could be adjudged from 55 years to 35 years.

A dishonorable discharge is an unquestionably severe punishment with significant impacts and a long-lasting stigma. *See United States v. Mitchell*, 58 M.J. 446 (C.A.A.F. 2003). The offense of attempted sexual assault of a child is also serious even though there was no actual child victim in this particular case. A mandatory punitive discharge is well within the range of minimum punishments Congress could rationally establish with respect to the offense of attempted sexual assault of a child. We find no violation of the constitutional prohibition against cruel and unusual punishment by the imposition of a mandatory dishonorable discharge in this case.

## F. Cumulative Error

Appellant asserts that even if none of the individual errors alleged by Appellant requires that the findings and sentence be set aside, the cumulative effect of the errors deprived him of a fair trial and warrant setting aside the findings and sentence. Again, we disagree.

### 1. Law

We review claims of cumulative error de novo. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). "Under the cumulative error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'" *Id.* (quoting *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A. 1992)). "Assertions of error without merit are not sufficient to invoke this doctrine." *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999). We will reverse the proceedings only if we determine the cumulative errors denied an appellant a fair trial. *See Pope*, 328 M.J. at 335. In addition, "appellate courts are far less likely to find cumulative error where the record contains overwhelming evidence of a defendant's guilt." *United States v. Flores*, 69 M.J. 366 (C.A.A.F. 2011) (citing *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996)).

### 2. Analysis

As discussed fully above, we found no error in Appellant's case and the evidence of Appellant's guilt of the offenses was overwhelming. Consequently, the cumulative error doctrine is inapplicable in this case.

## G. Timeliness of Appellate Review

### 1. Additional Background

Appellant's case was originally docketed with this court on 25 July 2018. As Appellant correctly asserts, the delay in rendering this decision after 25 January 2020 is presumptively unreasonable. However, we determine there has been no violation of Appellant's right to due process and a speedy post-trial review and appeal.

### 2. Law

We review de novo whether an appellant has been denied the right to due process and a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed before the court. *Id.* at 142. When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of cognizable prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39.

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.*; *see also Barker*, 407 U.S. at 533 ("[C]ourts must still engage in a difficult and sensitive balancing process."). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Moreno*, 63 M.J. at 136 (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

### 3. Analysis

The court is affirming the findings and sentence in this case. Appellant, who is no longer in confinement, has not pointed to any prejudice resulting from the presumptively unreasonable delay, and we find none.

Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. As a result, there is no due process violation. *See Toohey*, 63 M.J. at 362. In addition, we determine that, even in the absence of a due process violation, the delay does not merit relief. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude that the time taken to review Appellant's case is not unreasonable and relief based on the delay is unwarranted.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court